Patrick R. Leverty
**LEVERTY & ASSOCIATES LAW CHTD**
832 Willow Street
Reno, Nevada 89502
Telephone: (775) 322-6636
Facsimile: (213) 322-3953
Email: pat@levertylaw.com

***Liaison Counsel for Lead Plaintiffs***

UNITED STATES DISTRICT COURT
DISTRIC OF NEVADA

| | |
|---|---|
| In Re Spectrum Pharmaceuticals, Inc. Securities Litigation<br><br>This Document Relates To: All Actions | Master File No. 2:16-cv-02279-RFB-GWF<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Michael Bestwick and Mark Hawkins ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, press releases and other public disclosures, Spectrum Pharmaceuticals, Inc.'s ("Spectrum" or "Company")) United States Securities and Exchange Commission ("SEC") filings, United States Food & Drug Administration ("FDA") documents, analysts' reports and advisories about the

Company, and information readily obtainable on the Internet, and interviews with former employees of Spectrum. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Spectrum securities between January 31, 2013 and September 16, 2016, both dates inclusive (the "Class Period"). Lead Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. For nearly four years Defendants misled investors about the Company's progress seeking approval for apaziquone, one of only several late-stage development treatments in the Company's pipeline of drugs and therapies. According to Defendants apaziquone treats non-muscle invasive bladder cancer ("NMIBC"). After completing Phase I/II and II trials in 2005 and 2006, in 2007, Spectrum began carrying out two Phase III trials for apaziquone. One of the trials was conducted under the terms of a Special Protocol Assessment ("SPA") with the FDA, and the second was substantially similar. Defendants and the FDA agreed to analyze the trial results under a prespecified Statistical Analysis Plan ("SAP").

3. By December 2012, Defendants had completed both trials and they met with the FDA to discuss the results prior to submitting a New Drug Application ("NDA"). Defendants presented the FDA with top-line results as well as statistical analysis. Neither, however, was encouraging. Both studies failed to meet their primary endpoints of an improvement of recurrence rates at two years. Indeed, while each

reported an approximately 6% improvement, both had a confidence interval that included zero, making it impossible to rule out the possibility that apaziquone was actually less effective than the placebo.

4. Undeterred, at the December, 2012 meeting, directly contrary to the SAP for the trials, Defendants presented the agency with an analysis that pooled the data from the two Phase III trials, claiming that the pooled data showed a significant treatment effect over placebo thereby supporting FDA approval of apaziquone. During that December, 2012 meeting, the FDA expressly advised Defendants that because neither study met the pre-specified criteria for superiority as compared to placebo and the pooled analysis was done post-hoc, in direct violation of the SAP on which Spectrum and the FDA agreed, Spectrum's existing data did not support approval. Accordingly, the FDA "advised [Defendants] not to submit an NDA, and that if they did, a public [Oncologic Drugs Advisory Committee ("ODAC")] discussion would be required." Regulations prohibited the FDA from revealing publically its December, 2012, admonition to Defendants about apaziquone. Regulations imposed no such restriction on Defendants; they were free to tell the whole truth about the sum and substance of their December, 2012, meeting with the FDA. On the other hand, at a public ODAC meeting, the FDA was free to reveal both apaziquone's shortcomings that caused it to recommend against approval and that it had warned Defendants against filing an NDA based upon the data.

5. With knowledge or reckless disregard that the FDA advised the Company that the pooled data was insufficient to support approval and that the Company should not file an NDA for apaziquone, Defendants misled the market concerning the approval process for apaziquone. Generally, throughout the Class Period, Defendants falsely stated that while the two Phase 3 trials failed to meet their primary endpoints – i.e., neither study supported the effectiveness of apaziquone over placebo – "the pooled

data from the studies did show a statistically significant treatment effect." Further, based on the purported statistically significant treatment effect from the pooled data, Defendants positively spun their December, 2012, meeting with the FDA, stating generally that "we understand that the FDA can accept the NDA filing with the current Phase III data and will likely convene an Advisory Committee meeting."

6. Defendants omitted, however, that the FDA had plainly and directly told them ***not to file an NDA with the current Phase III data***, and that the FDA specifically convenes advisory committee meetings when it has special concerns about a study or product. At the same time, just after the December, 2012 meeting with the FDA, Defendant Shrotriya disposed of 378,343 shares of Spectrum stock at over $11 per share.

7. Disregarding the FDA's advice not to file an NDA, and well before they had completed an additional Phase III study that the FDA had demanded, in late 2015, Defendants filed an NDA for apaziquone. They based the NDA on the two Phase III studies that they acknowledged failed to meet their primary endpoints and the pooled data that the FDA had rejected as a basis for approval. On February 19, 2016, Spectrum announced that the FDA had accepted the NDA for review and indicated that it planned to hold an advisory committee meeting concerning the drug.

8. On September 14, 2016, the FDA convened an ODAC meeting to discuss Spectrum's NDA for apaziquone for NMIBC. In its presentation to the ODAC, the FDA revealed the truth behind Defendants' material misstatements concerning the approval of apaziquone, stating, in relevant part:

> In December 2012, the applicant presented a pooled analysis of the two trials that showed an approximately 6 percent decrease in the 2-year recurrence rate of bladder cancer on the apaziquone versus the placebo arms, and proposed to use these data to support an NDA submission.

> The FDA informed the applicant that since the pooling was not pre-specified, it would not be acceptable to support an approval. The FDA advised the applicant not to submit an NDA, and that if they did, a public ODAC discussion would be required.
>
> The sponsor submitted their NDA three years later, in December 2015. The division agreed to file the application, but reiterated that nothing had changed in terms of the acceptability of these data, and that a public ODAC discussion would be required, which is the purpose of our gathering today.

9. The ODAC voted unanimously to reject apaziquone, "there is substantial evidence of a treatment effect demonstrated in the data." Rejecting the pooled data – just as the FDA told Defendants it would in December, 2012 – one voting ODAC member stated, "and just from a more simplistic kind of viewpoint, this is what I tell my students how not to do things."

10. On September 14, 2016, Defendants disclosed that the "ODAC voted that [apaziquone] . . . has not shown substantial evidence of a treatment effect over placebo in patients with non-muscle invasive bladder cancer (NMIBC)," but further attempting to mislead the market, disclosing that the ODAC's "recommendation is not binding on the FDA, which makes the final decision on approval." That same day, the FDA published its Briefing Document from the ODAC meeting on its website, finally informing the public that in December, 2012, the agency had discouraged Defendants from submitting an NDA because of insufficient data supporting apaziquone's effectiveness.

11. On September 16, 2016, an article on *TheStreet.com* exposed additional details concerning the trouble with apaziquone's approval. On this news, the price of Spectrum common stock fell 12% from a September 13, 2016 close of $5.49 to a September 16, 2016 close of $4.82 per share on unusually heavy volume, damaging investors.

**JURISDICTION AND VENUE**

12. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

14. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Spectrum maintains its principal executive offices at 11500 South Eastern Avenue, Suite 240, Henderson, Nevada 89052, within this District, and a significant portion of the Defendants' actions, and the subsequent damages, occurred within this District.

15. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

16. As set forth in the Certifications they attached to the Motion of Michael Bestwick and Mark Hawkins to Consolidate Related Actions, For Appointment as Lead Plaintiffs and Approval of Counsel (ECF No. 6-3), Lead Plaintiffs Michael Bestwick and Mark Hawkins purchased Spectrum securities at artificially inflated prices during the Class Period and suffered damages as a direct and proximate result of Defendants' wrongdoing.

17. Defendant Spectrum is a biotechnology company focused on acquiring, developing, and commercializing drug products, with a primary focus in Hematology and Oncology. Spectrum currently markets six hematology/oncology drugs, and has three drugs in advanced stages of clinical development. Spectrum is a Delaware

corporation with offices located at 31355 Oak Crest Drive, Suite 275, Westlake Village, CA 91361. Spectrum common stock is traded on the NASDAQ under the ticker symbol "SPPI".

18. Defendant Rajesh C. Shrotriya ("Shrotriya") has been Spectrum's Chief Executive Officer ("CEO") and Chairman of the Board throughout the Class Period.

19. Defendant Kurt A. Gustafson ("Gustafson") has served as Spectrum's Chief Financial Officer ("CFO") from June, 2013 through the end of the Class Period.

20. Defendant Joseph W. Turgeon ("Turgeon") has served as Spectrum's President and Chief Operating Officer from April 17, 2014 through at least the end of the Class Period.

21. Defendant Lee F. Allen ("Allen") served as Spectrum's Senior Vice President and Chief Medical Officer from March, 2013 to January 2016.

22. Defendant Joseph K. Keller ("Keller") served as the Company's Executive Vice President and Chief Operating Officer from at least the beginning of the Class Period until April 17, 2014.

23. Defendants Shrotriya, Keller, Turgeon, and Allen are sometimes referred to herein as the "Individual Defendants."

24. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

25. Spectrum is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

26. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Spectrum under *respondeat superior* and agency principles.

27. Defendant Spectrum and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28. Defendants spent nearly four years lying to investors about the Company's progress in seeking approval of apaziquone, one of only several products it had in late-stage development. Defendants claimed that apaziquone treats NMIBC, asserting that treatment with apaziquone may "reduc[e] tumor recurrence by destroying dispersed cancer cells that would otherwise re-implant onto the inner lining of the bladder; destroy[] remaining cancer cells at the site of tumor resection (also known as chemo-resection); and destroy[] tumors not observed during resection (also known as chemo-ablation)."

29. As Defendants disclosed prior to the Class Period, they knew, no later than December, 2012, that the Company's two Phase III studies of apaziquone – Study 611 and Study 612 – showed no substantial evidence of a treatment effect over placebo in NMIBC patients. Notwithstanding these adverse facts, Defendants misled investors, stating that when they pooled the data from 611 and 612, the results showed statistically significant treatment effect over placebo that warranted approval of apaziquone. Throughout the Class Period, Defendants misled the market that the pooled data supported their filing of an NDA, notwithstanding that the FDA had expressly warned Defendants, prior to the Class Period, not to file an NDA for apaziquone.

***The FDA Approval Process***

30. Through an NDA, a sponsor such as Spectrum formally requests that the FDA approve a new drug for sale and marketing. In support of an NDA, the sponsor provides the FDA with data it gathered during trials assessing the drug's efficacy and safety along with other information such as proposed labeling, drug abuse information, and directions for use.

31. Once the FDA receives an NDA, the review team decides if it is complete, that it contains the required components outlined in the FDA's Application to Market a New or Abbreviated New Drug or Biologic for Human Use. Once the FDA determines that the NDA is complete, under the Prescription Drug User Fee Act ("PDUFA"), the FDA will review and provide a ruling on the application within 6 to 10 months, depending on whether the drug is selected for priority review.

32. The FDA review process involves full review by the review team of his or her section of the application. For example, medical officers and statisticians review clinical data while pharmacologists review data from clinical studies. FDA inspectors also travel to clinical study sites to determine whether any issue exists with data integrity. A project manager then assembles each individual review and any other

documents into an "action package," which becomes the record for FDA review, and the review team issues a recommendation.

33. An NDA includes an integrated summary of effectiveness ("ISE"), which is a comprehensive integrated analysis of the effectiveness of a study drug. Generally, analyses in the ISE are based primarily on the clinical effectiveness data included in the NDA. While analyses using pooled data (i.e., information combined from all studies) should be performed as part of the ISE, it is uncommon for clinical development programs to include a planned pooled analyses of efficacy. Pooled data is more commonly used to examine the effect of demographic (e.g., age, sex, race, and ethnicity) and other characteristics (e.g., presence of specific concomitant illnesses or treatments), where individual studies may have too few subjects with these characteristics to support any meaningful conclusions.[1]

34. The FDA bases its analysis of study results in an NDA on a pre-specified protocol for statistical analysis. While a drug's sponsor may include the results of analyses based on pooled data not specified in a protocol, the purpose of this data can only be to provide insights or lead to hypotheses for future studies. According to the ISE Guidelines,

> Although there are occasional clinical development programs that include a planned analysis of efficacy across more than one study, such analyses are unusual. For example, an NDA could include two large cardiovascular outcome studies, each examining major adverse cardiovascular events as their primary endpoint (e.g., cardiovascular death, nonfatal heart attack, and nonfatal stroke). A prospectively planned analysis of mortality across both studies can be

---

[1] *See* Integrated Summary of Effectiveness Guidance for Industry, U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER), October 2015 Procedural ("ISE Guidance"), available at https://www.fda.gov/downloads/drugs/guidances/ucm079803.pdf.

> specified as part of the development plan. Because prospectively planned efficacy analyses across two or more studies in a development program is uncommon, the majority of pooled analyses described for inclusion in the ISE are exploratory in nature. They are designed to probe the data for trends across more than one study (e.g., in disease-specific subgroups, trends across multiple doses).

35. While the FDA will act on some NDAs simply through the normal review process, sometimes, when there are special concerns about a product, it will organize a meeting of one of its advisory committees. For oncologic drugs, that committee is the ODAC.

***Spectrum Develops Apaziquone***

36. Apaziquone is a bio-reductive agent that is inserted directly into the bladder after surgery to remove tumors. The drug is then activated by enzymes that are overexpressed in bladder cancer cells.

37. In March, 2007, after carrying out Phase I/II and II trials for apaziquone, Spectrum reached a Special Protocol Assessment Agreement, or SPA, with the FDA for Study 611, a trial of a single instillation of intravesical apaziquone following transurethral resection of a bladder tumor. The Company designed a second study, Study 612, to be almost identical to Study 611. The SAP for the studies provided that the Company would analyze the data for each separately, and not pooled. The original SAP required 562 patients to be studied in each trial, but a later protocol amendment increased the sample size to 800. Study 611 enrolled 406 patients taking apaziquone and 396 given a placebo; Study 612 had 402 patients taking apaziquone and 411 given a placebo. The primary endpoint[2] for both trials was the proportion of patients with a

[2] According to the National Cancer Institute's Dictionary of Cancer Terms, a "primary endpoint" is the main result that a study measures to determine "if a given treatment worked (e.g., the number of deaths or the difference in survival between the treatment group and the control group). What the primary endpoint will be is decided before the study begins."

recurrence of a new bladder cancer on or before the two year point. Study 611 began in April, 2007 and Study 612 began in August, 2007. Both concluded in January, 2012.

38. In 2008, after carrying out Phase I and Phase I/II trials, Spectrum entered into a collaboration agreement with Allergan, Inc. ("Allergan") to develop and commercialize apaziquone. Allergan agreed to make payments to Spectrum both at the closing of the agreement and at the achievement of certain development, regulatory, and commercialization milestones. Spectrum would retain exclusive rights to apaziquone in Asia. Allergan received exclusive rights in the rest of the world, including the United States, with royalties to be paid to Spectrum, but both companies agreed to co-promote the drug in the United States. Under the terms of their agreement, Spectrum continued to conduct the apaziquone clinical trials, each company had exclusive rights to commercialize apaziquone in certain geographic territories, and they agreed to co-promote the drug. In 2013, Spectrum reacquired the rights for apaziquone in the United States in exchange for agreeing to pay royalties to Allergan.

39. In December, 2012, Spectrum presented data from Study 611 and Study 612 to the FDA. The FDA was not impressed, and told Defendants that the data and analysis they presented could not support a successful NDA.

40. Both studies failed to meet their primary endpoints of an improvement of recurrence rates at two years, something Defendants disclosed to investors. As Dr. Chana Weinstock, a medical officer with the FDA, later stated at the ODAC meeting held on September 14, 2016, however, after Defendants submitted an NDA against the FDA's strong advice, ***"[t]he confidence interval around the observed approximately 6 percent difference between arms did not exclude zero, meaning that we cannot rule out the possibility that the effect of apaziquone is less than that of placebo***." (Emphasis added.)

41. Dr. Erik Bloomquist, the FDA's primary statistical reviewer for the studies explained, in relevant part:

> [I]n study 611, there was an estimated 6.6 percent difference between apaziquone and placebo in 2-year recurrence with a 95 percent confidence interval of negative 1.8 percent to 15.1 percent. In study 612, there was a 6.2 percent difference in the 2-year recurrence rate, with a 95 percent confidence interval of negative 2.2 percent to 14. 6 percent.
> ***Now, this point is very important. Since both confidence intervals contain zero percent, essentially no difference between apaziquone and placebo, neither study has demonstrated that apaziquone is different from placebo with respect to 2-year recurrence rate.*** (Emphasis added).

Dr. Bloomquist further noted that "the estimated 6 percent difference was ***half*** the expected [12 percent] difference at the design stage that was considered clinically meaningful." (Emphasis added.)

42. Dr. Bloomquist further pointed out that each study included a large amount of missing data. The primary endpoint for the studies was recurrence at year 2. In both studies, approximately 20% of patients being treated with apaziquone who had not yet had a documented recurrence missed their scheduled assessment at the 24-month point. In addition, 24% of placebo patients in Study 611 and 8% of placebo patients in Study 612 also missed these appointments. Dr. Gwynn Ison, a medical officer with the FDA, noted on September 14, 2016 that "the amount of missing data was greater than the 6 percent difference in 2-year recurrence rates between the study arms on both studies." There was no way to know if these patients had a recurrence.

43. Dr. Ison pointed out that between the two studies, 78 patients who had no evidence of any tumor after review (i.e., who were misdiagnosed) received apaziquone. Treating a patient for a tumor they do not have would of course create false positive rates of non-recurrence.

44. In a critical problem, Spectrum presented the FDA – both in December, 2012 and again, despite the agency's warning, in the NDA it filed against the FDA's

advice – with a pooled analysis of data from the two trials, in violation of the SAP. Pooled data from different trials, however, can only be used when it is based on a pre-approved statistical analysis plan, normally to examine the effect of demographic and other characteristics, not to assess efficacy. As Dr. Chana Weinstock, an FDA medical officer, later stated at the September 14, 2016 ODAC meeting:

> In December 2012, the applicant presented a pooled analysis of the two trials that showed an approximately 6 percent decrease in the 2-year recurrence rate of bladder cancer on the apaziquone versus the placebo arms, and proposed to use these data to support an NDA submission. ***The FDA informed the applicant that since the pooling was not prespecified, it would not be acceptable to support an approval. The FDA advised the applicant not to submit an NDA,*** and that if they did, a public ODAC discussion would be required. (Emphasis added).

Dr. Weinstock further explained that when ***"[t]wo trials have failed to meet their primary endpoint[,] [s]trategies attempting to salvage these data by pooling two studies or by focusing on subgroup analyses are problematic."*** Emphasis added.)

45. While this information only became between September 14, 2016 and September 16, 2016, Spectrum received it as feedback from the FDA in December, 2012. At that time, it also agreed to conduct a third Phase III study. However, Spectrum took no immediate steps to initiate this trial.

46. Defendant Shrotriya responded to the FDA's December, 2012 feedback by selling a large quantity of his Company stock. On December 28, 2012 and December 31, 2012, Shrotriya sold 172,507 and 205,836 shares of Spectrum stock at weighted average prices of $11.35 and $11.2384 respectively, for proceeds of over $4.27 million.

47. On October 26, 2015, Spectrum announced that it was finally launching its third Phase III study, SPI-EOQ-13-305 ("Study 305").

48. Study 305 will assess the safety and efficacy of both the same treatment plan as Study 611 and 612 (single instillation of intravesical apaziquone following

transurethral resection of a bladder tumor) and multiple instillations of apaziquone following resection. The primary outcome measure is to evaluate time to recurrence with either one instillation of 4 milligrams of apaziquone or two instillations of 4 milligrams of apaziquone separated by two weeks relative to placebo instillation following tumor resection. According to the Company's October 26, 2015 press release, the first Study 305 patient was dosed with apaziquone on October 23, 2015. The trial is expected to yield results on which the FDA can act in approximately five years.

49. Shortly thereafter, with Study 305 far from complete and with no additional data beyond what they had presented to the FDA in December, 2012, ignoring the FDA's warning that the pooled data from Study 611 and Study 612 could not support FDA approval and that it would have to conduct and submit data from a third Phase III trial, Defendants filed an NDA for apaziquone. They based the NDA on the pooled data from Study 611 and Study 612.

50. On February 19, 2016, Spectrum announced that FDA had accepted the NDA for review and indicated that it would likely convene an advisory committee. The market – after over three years of deliberate misdirection of apaziquone's chances for approval – reacted positively, with Spectrum stock closing at $4.68 per share on February 19, up 5% from its $4.45 closing price the previous day. In an equity research report on Spectrum published on February 22, 2016, Jefferies LLC noted that the NDA acceptance and likelihood of an advisory committee evaluation during the third quarter of 2016 increased the chances of apaziquone moving forward. This perception, however, was based on Defendants' repeated false statements about their December 2012 meeting with the FDA, as discussed below.

51. According to former employees, the Company's own advisory committee of top urologists had told Defendants over and again for years—even before 2012—

that apaziquone was ineffective. Former Employee 1 ("FE1") was the Company's director of corporate and commercial compliance from September 2014 to May 2016, a key member of Spectrum's drug launch committees and responsible for monitoring all company-sponsored events, including medical advisory boards.[3] After the FDA accepted Spectrum's NDA for apaziquone for review but before the September 2016 ODAC meeting, Defendants attended the 2016 Annual Meeting of the American Urological Association ("AUA") in San Diego, California, from May 6 to May 10, 2016.

52. Again, according to FE1, on or about May 8, 2016 at the Hard Rock Hotel San Diego, Spectrum convened an advisory board meeting of approximately 11 distinguished urologists.[4] According to FE1, Defendant Shrotriya arrived at the meeting with his wife and his dog.

53. During the meeting with the distinguished urologists, Defendant Shrotriya attempted to convince them of apaziqoune's effectiveness. According to FE1, Defendant Shrotriya knew that at least 5 years prior to the May 8, 2016 meeting, a group of distinguished urologists that included overlapping members had rejected the effectiveness of apaziquone. Defendant Shrotriya knew that the Company's own panel

---

[3] FE1 was responsible for all compliance initiatives throughout the organization with focus on Sunshine and State Reporting transparency requirements and training. He reported directly to Spectrum's vice president of compliance, Angelique Lee-Rowley. He was a key member of Spectrum's Promotional Review, Grant, PAT and Compliance Committees and a key member of both Spectrum's FDA inspection teams and its drug launch committees. Periodically, FE1 reported directly to the corporate leadership and Spectrum's Board of Directors.

[4] That same day, at the AUA conference, in a breakout session from 6:00 a.m. to 8:00 a.m., several urologists presented a session on "AUA Guidelines 2016: Non-Muscle Invasive Bladder Cancer."

of outside urologists, according to FE1, believed that apaziquone was a flop, yet Shrotriya, himself, attempted to convince them otherwise. The Company's own panel of distinguished, outside urologists rejected Defendants Shrotriya's entreaties.

54. FE1 recalled that the majority of doctors in the room laughed and said that they told Spectrum years ago that apaziquone was ineffective and nothing had changed. FE1 recalls that the doctors Defendants, themselves, had convened also pointed out that even the pooled data from Study 611 and Study 612—the data on which Defendants had based the apaziquone NDA and touted to the public as establishing the treatment's efficacy—itself, failed to establish apaziquone's effectiveness

55. With respect to the pooled data on which Defendants relied to submit their NDA and which they touted to investors as establishing apaziquone's effectiveness, another former employee confirms that Defendant Shrotriya, himself, developed and promoted the idea of attempting to leverage the pooled data. Former Employee 2 ("FE2") served Spectrum as associate director of clinical affairs from March 2011 to August 2012 and then as associate director of medical affairs from August 2012 to January 2016. During the Class Period, she reported ultimately to Dr. Keith Steward, then Spectrum's vice president of global medical affairs and had reason to interact with Dr. Shanta Chawla, Spectrum's vice president of clinical research. Dr. Chawla led the apaziquone trials. Generally, FE2 recalls that Shrotriya was completely in charge at Spectrum and, the Board would do whatever he wanted, and that there were no checks and balances.[5]

---

[5] In the Consolidated Amended Complaint filed in *In re Spectrum Pharmaceuticals, Inc. Sec. Litig.*, Case. No. 2:13-cv-00433-LDG (CWH), former employees described Shrotriya as an "extremely controlling" CEO who presided over a Company run as the "Raj Shrotriya show." Defendant Shrotriya, himself, stated publicly, at the September 10, 2012 Rodman & Renshaw Global Investment Conference and then a September

56. FE2 recalls that after the December 2012 meeting, Defendant Shrotriya ignored the FDA's admonition with respect to an NDA for apaziquone. According to FE2, Dr. Raj does what Dr. Raj wants to do. FE2 recalls learning, most likely from Dr. Chawla or Dr. Steward, that Defendant Shrotriya, himself, came up with the idea of pooling the data from Study 611 and Study 612 when the trials failed to meet their primary endpoints.

57. Thus, by the beginning of the Class Period, Defendants knew or recklessly disregarded that the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials and that the pooled data on which Defendants' relied—and that they touted to the public—in fact, did not support apaziquone's effectiveness.

**MATERIALLY FALSE AND MISLEADING STATEMENTS**

58. On January 31, 2013, Defendants issued a press release, titled *Spectrum Pharmaceuticals Acquires Rights for Apaziquone in the U.S., Europe and Other Territories from Allergan; Expects to File New Drug Application*. In relevant part, the press release stated:

- Based on communication with the FDA, Spectrum anticipates an Advisory Committee meeting to review a potential NDA for apaziquone.
- The Company expects to file an NDA, which Spectrum will seek to expedite as part of a plan to achieve potential commercialization of apaziquone in key markets.
- Apaziquone is in development to treat non-muscle invasive bladder cancer (NIMBC) as a single instillation following transurethral resection of bladder tumor (TURBT).
- Approximately 70% of all patients with newly diagnosed bladder cancer have NMIBC, and yet there

27, 2012 interview with PropThink, that he personally interviewed every Spectrum employee, whether a salesperson, administrative assistant, or janitor.

are no FDA approved agents for post resection chemotherapy.

January 31, 2013 07:00 AM Eastern Standard Time

HENDERSON, Nev. (BUSINESS WIRE) Spectrum Pharmaceuticals (NasdaqGS: SPPI), a biotechnology company with fully integrated commercial and drug development operations with a primary focus in hematology and oncology, today announced the Company has reacquired development and commercialization rights for apaziquone in the United States, Europe and other territories pursuant to an agreed upon restructuring of Spectrum's collaboration with Allergan, Inc. In exchange, Allergan will receive a royalty on future revenue. Apaziquone is an anticancer agent being developed for the treatment of non-muscle invasive bladder cancer (NIMBC) as a single instillation following transurethral resection of bladder tumor (TURBT).

***Spectrum also announced that a scheduled meeting with the U.S. Food & Drug Administration (FDA) was held last month to discuss the results from the Company's Phase 3 clinical trials. Based on the discussions with the FDA, Spectrum understands that the FDA can accept the NDA filing with the current Phase III data and will likely convene an Advisory Committee meeting. Further, based on discussions with the FDA, Spectrum has agreed to conduct one additional Phase III study following consultation with the FDA on its design***.

"Regaining apaziquone rights will enable Spectrum to take the steps we believe are essential to advancing apaziquone toward commercialization in the U.S., Europe and other key territories," stated Rajesh C. Shrotriya, M.D., Chairman, President and Chief Executive Officer of Spectrum Pharmaceuticals, Inc. "***Spectrum is committed to expediting our program for apaziquone, with the goal of accelerating potential registration and integrating apaziquone into our plan to expand our footprint in the U.S. and build our presence in the EU. Spectrum is grateful to the FDA for its thoughtful feedback on the apaziquone clinical program***. We believe there continues to be a significant unmet need as no drugs have been approved and marketed in the U.S. for more than 20 years for low-grade NMIBC."

Apaziquone is an anticancer drug that requires activation by bioreductive enzymes that are overexpressed in bladder cancer cells, to render it a cytotoxic alkylating agent. Spectrum conducted two multicenter, international Phase 3 trials of a single dose of intravesical instillation of apaziquone into the bladder in the immediate postoperative period after surgical resection of low-grade, non-muscle

> invasive bladder tumors. ***In April 2012, Spectrum announced that the Phase 3 trials did not meet their primary endpoint of a statistically significant difference in the rate of tumor recurrence at 2 years between treatment and placebo arms. However, analysis of the pooled data from both studies showed a statistically significant treatment effect in favor of apaziquone in the primary endpoint of the rate of tumor recurrence at 2 years (pvalue = 0.0174) and in a key secondary endpoint, time to recurrence (pvalue = 0.0076)***. (Emphasis added).

59. The foregoing statements in the January 31, 2013 press release were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

60. On February 21, 2013 at 1:30pm EST, Defendants convened a conference call with analysts concerning the Company's fiscal 2012 results that it had announced in a press release that morning. During that Conference call Defendants Shrotriya stated:

> In addition, last month, we were able to reacquire U.S. and European rights to a later stage drug apaziquone, formally known as EOquin. Our goal is to accelerate apaziquone's potential registration. There continues to be a significant unmet medical need, but no drugs have been approved and marketed in the United States for more than 20 years for low-grade non-muscle invasive bladder cancer.

61. Following on the comments of Defendant Shrotriya, Defendant Keller stated that Defendants "***anticipate[d] filing 2 New Drug Applications in the next 12 months***, one for belinostat and one for ***apaziquone***." (Emphasis added).

62. During the question and answer session with analysts on the February 21, 2013 conference call, George B. Zavoico of MLV & Co, LLC, Research Division ("Zavoico") and Defendant Shrotriya had the following exchange:

> **Zavoico**: Second question, with your [apaziquone] which for a long time has been, I thought, one of your crown jewels. You've got it back the full rights back. Where does it stand now? I know you're going to meet with the FDA to see maybe you already know if the FTC had to move forward with the results of the combining the results of the 2 trials.
>
> **Shrotriya**: So George, we had a meeting with the FDA, and ***the bottom line message that we received was the following: that number one, we can file the NDA with the existing data; number two, FDA will most likely convene an advisory board meeting; and number three, FDA encourages us to start at least one new trial to which they will contribute their suggestions***. We have written a protocol. We have sent it to the FDA and as soon as it comes in, we have got over 100 sites ready to start enrolling patients. These are the sites that have already worked on 2 previous trials, 611 and 612. ***And the interesting thing about the 2 studies we have submitted is that both studies don't read the criteria of 0.05***. ***The data is so close that when you combine the 2 trials, the data is significant at 0.01 level, what we call highly significant. And also when you see the 2 studies, they are like mirror images***. They will turn in different patient population, by different investigators and yet the results are almost identical. ***And that's very pointing. For us it is very exciting to see the 2 studies done apart have such similar findings, and I think the FDA's persuaded***. And we are going to pursue the registration for this indication as quickly as possible.
>
> **Zavoico**: And the registration will also be independent of this new trial starting? Is that correct?
>
> **Shrotriya**: Well, we plan to file the NDA before this trial is completed. So there is what we are trying to do is take advantage of the fact that FDA take certain times, review time, for any drug ensuring that so when we file the NDA, we are hoping that by the time our review process comes, we will have completed enrollment in that trial.
>
> **Zavoico:** So you won't have results?
>
> **Shrotriya**: That is true. We could have interim results at that time. That's what we are negotiating with the FDA.

63. The foregoing comments of Defendants during the February 21, 2013 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

64. On February 28, 2013, Defendants filed with the SEC their Annual Report on Form 10-K for the year ended December 31, 2012 (2012 10-K). About Apaziquone, Defendants stated that the Company has engaged in two large, Phase 3 clinical trials for non-muscle invasive bladder cancer in strategic collaboration with Nippon Kayaku Limited.[6] With respect to its clinical trials and FDA approval of Apaziquone, Defendants stated, in relevant part:

> ***Optimizing our development portfolio and maximizing the asset values of its components***. While over the recent few years, we have evolved from a development-stage to a commercial-stage pharmaceutical company, we have maintained a highly focused development portfolio. Our strategy with regard to our development portfolio is to focus

[6] 2012 10-K at 4. Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, on Exhibit 32.1, appended to the 2012 10-K, Defendant Shrotriya certified that, to his knowledge, the 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Report fairly presents in all material respects the financial condition and results of operations of Spectrum Pharmaceuticals, Inc." In addition, on Exhibit 31.1, appended to the 2012 10-K, Defendant Shrotriya also certified "based on his knowledge," that the 10-Q contained no "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

> on late-stage drugs and to develop them safely and expeditiously to the point of regulatory approval. We plan to develop some of these drugs ourselves or with our subsidiaries and affiliates, or secure collaborations with third parties such that we are able to suitably monetize these assets. We have assembled a drug development infrastructure that is comprised of highly experienced and motivated MDs, PhDs, clinical research associates and a complement of other support personnel to develop these drugs. ***In April 2012, we announced that the single instillation Phase 3 clinical trials for apaziquone did not meet their primary endpoint however the pooled data from the studies did show a statistically significant treatment effect. A meeting with the FDA was held in December 2012 to discuss the results from these clinical trials. Based on the discussions with the FDA, we understand that the FDA can accept the NDA filing with the current Phase III data and will likely convene an Advisory Committee meeting. Further, based on discussions with the FDA, we have agreed to conduct one additional Phase III study following consultation with the FDA on its design***. (Emphasis in original and added).[7]

65. The foregoing statements in the Company's 2012 10-K were materially false and misleading because Defendants knew or were reckless in not knowing that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

66. On March 12, 2013, Defendants issued a press release, updating investors on the Company's first quarter performance they anticipated and their 2013 outlook for the Company. With respect to Apaziquone, Defendants stated that they "***anticipate that [Spectrum] will file an NDA for Apaziquone in 2014***." Again, on March 14, 2013, Defendants issued a press release, concerning the Company's obtaining the rights to

---

[7] 2012 10-K at 5, 12, 51.

"Captisol-enabled melphalan." In describing the Company's portfolio of drugs, Defendant Shrotriya stated "We are pleased to add this late-stage program to our portfolio, which includes belinostat, for which we anticipate an NDA filing mid-year, and ***apaziquone, for which we expect to file an NDA in 2014***."

67. The foregoing statements in the March 12, 2013 and March 14, 2013 press releases were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

68. Also on May 9, 2013, Defendants filed with the SEC a quarterly report on Form 10-Q for the period ended March 31, 2013. Brett Scott, then Spectrum's Acting Chief Financial Officer, signed the May 9, 2013 10-Q. About the Company's business strategy, Defendants stated:

> ***Optimizing our development portfolio and maximizing the asset values of its components***. While over the recent few years, we have evolved from a development-stage to a commercial-stage pharmaceutical company, we have maintained a highly focused development portfolio. Our strategy with regard to our development portfolio is to focus on late-stage drugs and to develop them safely and expeditiously to the point of regulatory approval. We plan to develop some of these drugs ourselves or with our subsidiaries and affiliates, or secure collaborations with third parties such that we are able to suitably monetize these assets. We have assembled a drug development infrastructure that is comprised of highly experienced and motivated MDs, PhDs, clinical research associates and a complement of other support personnel to develop these drugs. ***In April 2012, we announced that the single instillation Phase 3 clinical trials for apaziquone did not meet their primary endpoint, however, the pooled data from the studies did show a statistically significant treatment effect. A meeting with the***

> ***FDA was held in December 2012 to discuss the results from these clinical trials. Based on the discussions with the FDA, we understand that the FDA can accept the NDA filing with the current Phase III data and will likely convene an Advisory Committee meeting. Further, based on discussions with the FDA, we have agreed to conduct one additional Phase III study following consultation with the FDA on its design***.[8] (Emphasis in original and added).

69. The foregoing statements in the May 9, 2013 10-Q were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

70. On August 6, 2013, Defendants filed with the SEC a Registration Statement on Form S-3, enabling selling stockholders "to sell or otherwise dispose of, from time to time, up to an aggregate of 3,000,000 shares of our common stock." Selling Stockholders were Deerfield Private Design Fund, L.P., Deerfield Special

---

[8] May 9, 2013 10-Q, at 31-32. Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, on Exhibit 32.1, appended to the May 9, 2013 10-Q, Defendant Shrotriya certified that, to his knowledge, the 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Report fairly presents in all material respects the financial condition and results of operations of Spectrum Pharmaceuticals, Inc." In addition, on Exhibit 31.1, appended to the May 9, 2013 10-Q, Defendant Shrotriya also certified "based on his knowledge," that the 10-Q contained no "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

Situations Fund, L.P., Deerfield Special Situations Fund, Ltd., and Deerfield Private Design International, L.P., all entities affiliated with Deerfield Management, LLC. About apaziquone, Defendants stated:

> We are a biotechnology company with fully integrated commercial and drug development operations with a primary focus in hematology and oncology. Our strategy is comprised of acquiring, developing and commercializing a broad and diverse pipeline of late-stage clinical and commercial products. In the United States, we market three oncology drugs, FUSILEV®, FOLOTYN® and ZEVALIN®, and also market ZEVALIN outside of the U.S. We have two drugs, apaziquone and belinostat, in late stage development along with a diversified pipeline of novel drug candidates. We have assembled an integrated in-house scientific team, including formulation development, clinical development, medical affairs, regulatory affairs, biostatistics and data management, and have established a commercial infrastructure for the marketing of our drug products. We also leverage the expertise of our worldwide partners to assist in the execution of our strategy. Apaziquone was studied in two large Phase 3 clinical trials for non-muscle invasive bladder cancer and is under strategic collaborations with Nippon Kayaku Co. Ltd. and Handok Pharmaceuticals Co. Ltd. Belinostat is being studied in multiple indications including a Phase 2 registrational trial for relapsed or refractory peripheral T-cell lymphoma, or PTCL, and is under a strategic collaboration with TopoTarget A/S. FOLOTYN is being further developed under a collaboration agreement with Mundipharma International Corporation Limited.[9]
>
> ***
>
> Optimizing our development portfolio and maximizing the asset values of its components. While over the recent few years, we have evolved from a development-stage to a commercial-stage pharmaceutical company, we have maintained a highly focused development portfolio. Our strategy with regard to our development portfolio is to focus on late-stage drugs and to develop them safely and expeditiously to the point of regulatory approval. We plan to develop some of these drugs ourselves or with our subsidiaries and affiliates, or secure collaborations with third parties such that we are able to suitably monetize these assets. We have assembled a drug development infrastructure

[9] August 6, 2013 S-3 at 2.

> that is comprised of highly experienced and motivated MDs, PhDs, clinical research associates and a complement of other support personnel to develop these drugs. ***In April 2012, we announced that the single instillation Phase 3 clinical trials for apaziquone did not meet their primary endpoint, however, the pooled data from the studies did show a statistically significant treatment effect. A meeting with the FDA was held in December 2012 to discuss the results from these clinical trials. Based on the discussions with the FDA, we understand that the FDA can accept the New Drug Application, or NDA, filing with the current Phase III data and will likely convene an Advisory Committee meeting. Further, based on discussions with the FDA, we have agreed to conduct one additional Phase III study following consultation with the FDA on its design***.[10] (Emphasis added).

71. The foregoing statements in the August 6, 2013 S-3 were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

72. Also on August 7, 2013, at 4:30 p.m. EDT, Defendants convened a conference call concerning the Company's results for the second quarter of fiscal 2013, ended June 30, 2013. In their remarks, Defendants were silent about apaziquone. In colloquy with analyst George B. Zavoico of MLV & Co LLC, however, they did discuss apaziquone as follows:

> **Zavoico**: I have a question about one you didn't talk about and that was apaziquone. You were moving towards talking with the FDA about some sort of filing, coming up soon, an NDA filing. Could you elaborate on that, please?

---

[10] August 6, 2013 S-3 at 3.

> **Shrotriya**: So George, with apaziquone, as you know that we met with the FDA, and ***the understanding with the FDA was that we can file the NDA with apaziquone. However, they wanted us to submit a protocol, so a subsequent study in which they wanted almost all of the patients entered, almost all of the patients to be entered in the study because their concern was that if they approve a drug, you cannot complete a trial of that kind***. So the protocol has been submitted to the FDA, and we are awaiting comments from the FDA at this time, but certainly our plan and our hope is that ***we'll plan to file the NDA as soon as we can have an understanding with the FDA***. (Emphasis added).

73. The foregoing statements during the August 7, 2013 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

74. On August 9, 2013, Defendants filed with the SEC the Company's quarterly report on Form 10-Q for the quarter ended June 30, 2013.[11] Defendant Gustafson signed the August 9, 2013 10-Q. About apaziquone, defendants reiterated:

---

[11] Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, on Exhibit 32.1, appended to the August 9, 2013 10-Q, Defendants Shrotriya and Gustafson certified that, to their knowledge, the 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Report fairly presents in all material respects the financial condition and results of operations of Spectrum Pharmaceuticals, Inc." In addition, on Exhibit 31.1, appended to the August 9, 2013 10-Q, each of Defendants Shrotriya and Gustafson also certified "based on his knowledge," that the 10-Q contained no "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

> ***Optimizing our development portfolio and maximizing the asset values of its components.*** While over the recent few years, we have evolved from a development-stage to a commercial-stage pharmaceutical company, we have maintained a highly focused development portfolio. Our strategy with regard to our development portfolio is to focus on late-stage drugs and to develop them safely and expeditiously to the point of regulatory approval. We plan to develop some of these drugs ourselves or with our subsidiaries and affiliates, or secure collaborations with third parties such that we are able to suitably monetize these assets. We have assembled a drug development infrastructure that is comprised of highly experienced and motivated MDs, PhDs, clinical research associates and a complement of other support personnel to develop these drugs. ***In April 2012, we announced that the single instillation Phase 3 clinical trials for apaziquone did not meet their primary endpoint, however, the pooled data from the studies did show a statistically significant treatment effect. A meeting with the FDA was held in December 2012 to discuss the results from these clinical trials. Based on the discussions with the FDA, we understand that the FDA can accept the NDA filing with the current Phase III data and will likely convene an Advisory Committee meeting. Further, based on discussions with the FDA, we have agreed to conduct one additional Phase III study following consultation with the FDA on its design***. (Emphasis in original and added).[12]

75. The foregoing statements in the August 9, 2013 10-Q were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

---

statements were made, not misleading with respect to the period covered by this report."

[12] August 9, 2013 10-Q at 34-35.

76. On November 12, 2013 at 4:30 p.m. EST, Defendants convened a conference call concerning the Company's results for the second quarter of fiscal 2013, ended June 30, 2013. During that November 12, 2013 conference call, about the Company's efforts to achieve FDA approval for apaziquone Defendant Keller added:

> Regarding our other advance stage drug apaziquone, as previously reported, we have completed 2 Phase III trials. While each of these 2 pivotal trials individually did not achieve statistical significance, ***when the data from the 2 studies were combined, results were statistically significant and appear to be clinically meaningful. We plan to start another Phase III study and file a New Drug Application in 2014***.
>
> ***
>
> Before handing the call back to Dr. Raj, I'm going to share with you the goals that we have set for our organization. We expect 2014 to be a busy, productive year, marked by a number of value-creating milestones. . . . Number 4, our plan is to file the New Drug Application for apaziquone and start another Phase III study based on the learnings from the previous studies. (Emphasis added).

77. The foregoing statements in during the November 12, 2013 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

78. On November 18, 2013 Defendants filed with the SEC the Company's quarterly report on Form 10-Q for the quarter ended June 30, 2013.[13] Defendant

[13] Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, on Exhibit 32.1, appended to the November 18, 2013 10-

Gustafson signed the November 18, 2013 10-Q. About apaziquone, defendants reiterated:

> ***Optimizing our development portfolio and maximizing the asset values of its components.*** While over the recent few years, we have evolved from a development-stage to a commercial-stage pharmaceutical company, we have maintained a highly focused development portfolio. Our strategy with regard to our development portfolio is to focus on late-stage drugs and to develop them safely and expeditiously to the point of regulatory approval. We plan to develop some of these drugs ourselves or with our subsidiaries and affiliates, or secure collaborations with third parties such that we are able to suitably monetize these assets. We have assembled a drug development infrastructure that is comprised of highly experienced and motivated MDs, PhDs, clinical research associates and a complement of other support personnel to develop these drugs. ***In April 2012, we announced that the single instillation Phase 3 clinical trials for apaziquone did not meet their primary endpoint, however, the pooled data from the studies did show a statistically significant treatment effect. A meeting with the FDA was held in December 2012 to discuss the results from these clinical trials. Based on the discussions with the FDA, we understand that the FDA can accept the NDA filing with the current Phase III data and will likely convene an Advisory Committee meeting. Further, based on discussions with the FDA, we have agreed to conduct one additional Phase III study following consultation with the FDA on its design***. (Emphasis in original and added).[14]

---

Q, Defendants Shrotriya and Gustafson certified that, to their knowledge, the 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Report fairly presents in all material respects the financial condition and results of operations of Spectrum Pharmaceuticals, Inc." In addition, on Exhibit 31.1, appended to the November 18, 2013 10-Q, Defendants Shrotriya and Gustafson each also certified "based on his knowledge," that the 10-Q contained no "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

[14] November 18, 2013 10-Q at 42.

79. The foregoing statements in the November 11, 2013 10-Q were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

80. On December 20, 2013, Defendants filed with the SEC and disseminated a prospectus supplement, relating to their registration, enabling "selling stockholders" to sell up to 3 million shares of the Company's common stock. In the December 20, 2013 prospectus, about apaziquone, Defendants stated:

> ***Optimizing our development portfolio and maximizing the asset values of its components***. While over the recent few years, we have evolved from a development-stage to a commercial-stage pharmaceutical company, we have maintained a highly focused development portfolio. Our strategy with regard to our development portfolio is to focus on late-stage drugs and to develop them safely and expeditiously to the point of regulatory approval. We plan to develop some of these drugs ourselves or with our subsidiaries and affiliates, or secure collaborations with third parties such that we are able to suitably monetize these assets. We have assembled a drug development infrastructure that is comprised of highly experienced and motivated MDs, PhDs, clinical research associates and a complement of other support personnel to develop these drugs. ***In April 2012, we announced that the single instillation Phase 3 clinical trials for apaziquone did not meet their primary endpoint, however, the pooled data from the studies did show a statistically significant treatment effect. A meeting with the FDA was held in December 2012 to discuss the results from these clinical trials. Based on the discussions with the FDA, we understand that the FDA can accept the New Drug Application, or NDA, filing with the current Phase III data and will likely convene an Advisory Committee meeting. Further, based on discussions with the FDA, we have***

> ***agreed to conduct one additional Phase III study following consultation with the FDA on its design***.[15]

81. The foregoing statements in the December 20, 2013 Prospectus were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

82. On March 6, 2014, Defendants issued a press release, summarizing the Company's results for the fourth quarter and fiscal year ended December 31, 2013. That same day, at 4:30 p.m. EST, Defendants convened a conference call to discuss the Company's 2013 results. During the conference call, both Defendants Shrotriya and Keller touted the Company's progress as follows:

> **Shrotriya**: This is our first full quarter of reporting sales from Marqibo, and we're excited about its future. ***We remain focused on other potential growth drivers*** like Marqibo's potential additional indications such as in aggressive non-Hodgkin's lymphoma and adult ALL; ***apaziquone for superficial bladder cancer***; and ZEVALIN for the treatment of diffuse large Bcell lymphoma.
>
> ***
>
> **Keller**: Regarding our other advance-stage drug apaziquone, we plan to start another Phase III study and file a New Drug Application in 2014.
>
> ***
>
> Before handing the call back to Dr. Raj, I'm going to share with you the goals we have set for our organization. We expect 2014 to be an active and productive year, marked by

[15] December 20, 2013 Form 424B3 at 3.

> a number of key value-creating milestones. . . . ***Number four, we plan – our plan is to file the New Drug Application for apaziquone and start another Phase III based on the learnings from previous studies***. (Emphasis added).

83. The foregoing statements during the March 6, 2014 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

84. On May 8, 2014 at 4:30 p.m. EDT, Defendants convened a conference call to discuss the Company's results for the quarter ended March 31, 2014 that they had summarized in a May 8, 2014 press release. About apaziquone, in their remarks, Defendants stated:

> **Shrotriya**: Beyond the ones I have just mentioned, there are ***several growth opportunities and catalysts inside the company***. For example, expansion of indications for Marqibo in non-Hodgkin's lymphoma, ZEVALIN in diffuse large Bcell lymphoma and new agents like SPI1620 and ***apaziquone***, among others, which make us even more excited about the growth prospects for the company.
>
> ***
>
> **Allen**: The medical development group at Spectrum remains focused on aggressively advancing our portfolio with an emphasis on addressing important unmet medical needs for cancer patients. We're very fortunate to have such a robust pipeline and are working to further optimize our infrastructure with the goals of improving the speed and efficiency of all our development activities.
>
> There is a true sense of urgency here as we work to quickly bring our project to key milestones and decision points, with a focus on strategically allocating our resources, using patients and value as the key drivers.

***

> ***For apaziquone, our plan is to file a New Drug Application and start another supportive Phase III study in patients with superficial bladder cancer, based on the learnings from our previous studies***. (Emphasis added).

85. The foregoing statements during the May 8, 2014 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

86. On August 7, 2014 at 4:30 p.m. EDT, Defendants convened a conference call to discuss the Company's results for the quarter ended June 30, 2014 that they had summarized in an August 7, 2014 press release. In his remarks, Defendant Shrotriya stated:

> Thank you, Dr. Lee. As you just heard, this is an exciting time for Spectrum and the foundation is in place to continue to leverage our growth. We continue to develop and grow into a much more diversified company. We now have 5 drugs on the market. ***We will be submitting another New Drug Application*** for Captisol-enabled melphalan soon and ***for Apaziquone thereafter***. We will make a very important decision on one of our highest priorities in our pipeline, SPI2012, and continue to prioritize our programs.

87. The foregoing statements during the August 7, 2014 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support

approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

88. On March 13, 2015, Defendants issued a press release, summarizing the Company's results for the fourth quarter and fiscal year ended December 31, 2014. In that press release, about apaziquone, Defendants stated:

> ***Apaziquone, a potent tumor-activated prodrug for non-muscle invasive bladder cancer, showed statistically significant results in a post-hoc subgroup analysis of two Phase 3 studies (p=0.001); Company plans NDA submission this year***.
>
> ***
>
> - Apaziquone: a tumor-activated prodrug; potentially 1st new drug for NMIBC in >40 years
>
> - Adjuvant use of apaziquone for immediate intravesical instillation following transuretheral resection (TUR) of non-muscle invasive bladder cancer (NMIBC) demonstrate a high response rate of marker lesions (69%) with nearly 50% of patients remaining tumor-free after 18 months in Phase 1/Phase 2 studies.
>
> - ***Reanalysis of data from two completed randomized, placebo-controlled Phase 3 studies demonstrates a lower 2 year recurrence rate with apaziquone compared to placebo in the intent-to-treat (ITT) Population (Study 1 (n=802): 36.9% versus 42.2%, respectively, p= 0.130; Study 2 (n=812): 40.0% versus 46.1%, respectively, p= 0.082)***.
>
> - Statistically significant differences in 2 year recurrence rates shown in the subgroup of ITT patients receiving apaziquone 30 to 90 minutes post-TUR (Study 1 (n=141): 24.4% versus 40.7%, respectively, p= 0.040; Study 2 (n=152): 32.9% versus 51.3%, respectively, p= 0.022) likely due to less post-TUR bleeding.
>
> - ***Integrated analyses of the two Phase 3 studies also demonstrate statistically significant differences in 2 year recurrence rates for apaziquone versus placebo in both the overall TaG1G2 Population (n=1,146; 38.8% versus 45.5%, respectively, p= 0.022) and in the combined subgroup analysis (n=217; 28.2% versus 50.0%, respectively, p= 0.001)***.

- The drug is well tolerated with no systemic toxicities.
- ***An NDA submission for apaziquone based on the completed studies is planned for this year***.
- A new Phase 3 study in NMIBC is planned that will specifically focus on the administration of apaziquone to all patients in the 31 to 90 minute window post-TUR, and will also include a second intravesical administration 8 days later.

89. The foregoing statements in the March 13, 2015 press release were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

90. On March 13, 2015, at 10:00 a.m. EDT, Defendants convened a conference call to discuss the Company's results for the quarter and fiscal year ended December 31, 2014 that they had summarized in a March 13, 2015 press release. During this conference call, Defendant Shrotriya stated:

> I am here to share today about the drugs that are value drivers in the short run, within the next 3 to 5 years. But before I do that, I do want to say about Fusilev. You heard recently that Sandoz has been granted approval to market or launch generic levoleucovorin. We're in the process of filing appeal with the higher courts. And we have asked for injunction to not allow Sandoz to market the drug. We have been temporarily granted this injunction. And if Sandoz is allowed to market the drug, we could lose revenue. That's a fact.
>
> And I wanted to just not focus today about yesterday as much as I want to focus about going forward, about what the future lies for the Company. Today you will be hearing about four of our drugs. Two are near-term NDAs. In other words, one NDA has already been filed for Captisol-enabled Melphalan. FDA has given us a PDUFA date, or the decision date, of

> October 23, 2015. In fact, if it is approved, this drug -- we could be selling this drug before the end of this year.
>
> The second is that we plan to file another NDA for Apaziquone, the bladder cancer drug. And we have two experts talking about CE Melphalan: Professor Hari, Parameswaran Hari; and Professor Witjes, who has been involved with the development of this drug from its inception.

91. During the same March 13, 2015 conference call, about apaziquone, Defendants Turgeon state:

> **Turgeon**: We're excited about this, and that's this year. Apaziquone -- some of you know about Apaziquone; some of you don't. This is an exciting molecule. And the reason I say this is when you look at bladder cancer, it's an insidious disease. There has been nothing for 40 years to treat this. You talk about unmet medical need.
>
> What happened in the past is we did two Phase III trials, and ***unfortunately, when you got to the end, the p-value wasn't appropriate on either one. But interesting enough, when you put the data together and looked at the data, wow. You had a subset of patients that looked really exciting. There is potential that this drug works***.
>
> What we also know is that when blood gets in contact with Apaziquone, it breaks it down. And that happened to some patients, because you have the TERP procedure before, which is a surgical procedure. There was some bleeding involved.
>
> ***So now what we have done -- we have gone through the update. We're going to resubmit at the end of this year the same data combined***. We've also designed a new Phase III trial that we'll obviously give probably two doses and we'll have -- make sure there is no blood involvement. So that’s a potential drug here in a big unmet medical need. (Emphasis added).

92. Also during the March 13, 2015 conference call, about apaziquone, Defendant Allen stated:

> Now, delivering on the promise of this pipeline requires that we be excellent in our execution, and that's really critically important -- and that we have the ability to use the data that we have to develop a compelling story that supports both registration and commercialization. I think we have a track

> record of doing that. And I think our team has demonstrated that with the recent submission and approval of Belinostat, and then the reason submission of the CE Melphalan NDA. ***And we will be continuing to build on the successes with the submission of the Apaziquone NDA*** and then execution of the development plans for SPI-2012 and Poziotinib.
>
> ***
>
> Apaziquone -- again, it's a drug that, again, really meets an unmet medical need. And we will hear more about that later today.

93. The foregoing statements during the March 13, 2015 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

94. Also during the March 13, 2015 conference call, Defendants called upon Dr. J.A. "Fred" Witjes, an "academic urologist, who, himself, had participated in the apaziquone clinical trials, to share his perspectives on apaziquone. In relevant part, Dr. Witjes stated:

> Second thing -- Joe already said that, unfortunately, the two studies separately just didn't get the anticipated endpoint, although there was a difference of around 5% to 6% between Apaziquone and placebo, with an advantage for, of course, Apaziquone in the recurrence rate. In itself these two studies were not significant.
>
> However, I just told you that blood doesn't activate Apaziquone. I know as a urologist what I take away the tumor, it still bleeds a few minutes. So we thought, well, let's exclude those patients that had their instillation within this first 30 minutes. And you suddenly see, then, that there is a large difference.

> This is where patients have been excluded in these two studies, who had the study drug within the first 30 minutes, so there might have been some bleeding. Probably there was some bleeding, which inactivates the drug. There you see suddenly that the difference is much, much higher. Not only statistically significant, but the difference of around 15% to 20% is also clinically very, very relevant for my patients. So that's very nice.
>
> And if you then combine again the two studies, obviously, also in the initial data set, you will reach statistical significance. That's, of course, because of the numbers; they are much higher then. But also, if you would look at those patients that didn't have a very early instillation -- if you will exclude those, you see that the difference is very, very large, around 20% plus. Statistically obviously very significant, but again, clinically also very relevant for my patients.
>
> My last slide, my conclusion: noninvasive bladder cancer and Apaziquone -- first, we do need something new, guys, in bladder cancer. Please. We are already doing the same for around 40 years. With regard to mechanism of action, Apaziquone really has some advantages. That translates to very well efficacy in vitro and also in vivo. We have some studies where this shows to be a very effective drug.

95. Responding to Dr. Witjes's presentation during the March 13, 2015 conference call, Defendants Turgeon stated:

> Now we're back to the short people. I think Dr. Witjes made a very compelling argument for, again, a significant unmet medical need in this disease of bladder cancer. And ***clearly, the data supports that in a subpopulation of patients that were studied, there is activity that is pretty significant***.
>
> We are moving forward with this NDA filing. We will have discussions with the FDA about that further. And also we will be starting another study that looks at that subpopulation.
>
> I mean, obviously, targeting a subpopulation in all of our clinical trials where we think we will see the most positive activity is the best strategy in drug development. So that's a study that will be up and running as well. In that study we are also going to add a second dose as a little bit of reinforcement. And that dose will be a little bit later, so a little bit more distant from the surgery. So, again, the bleeding won't be an issue for that.
>
> But, again, I ***think a very exciting opportunity for us. And we're looking forward to bringing that NDA to filing***. (Emphasis added).

96. During the question and answer segment of the March 13, 2015 conference call, colloquy ensued with Joe Pantginis of Roth Capital and Defendant Shrotriya and Dr. Witjes as follows:

> **Pantginis**: Joe Pantginis, ROTH Capital. On the Apaziquone concept, you just touched upon it -- the FDA seems certainly open and willing to be able to combine the data so you can file, so that's a good thing. Are there any precedents you can share with regard to combining studies that were not significant and then moving on?
>
> **Shrotriya**: So -- I just don't want to mislead this point. So FDA initially said no, forget it. You didn't meet the endpoint. Then we went there, and we pleaded.
>
> We took Mark Soloway, one of our consultants and investigator to the FDA. And we were able to convince the FDA, number one, that this is an unmet medical need. No drug has been approved in the last 40 years. And here is a drug that single administration of 4 milligram dose produces this significant effect. And mind you, what data you saw, the protocol that we had the SPA was the relapse rate at two years.
>
> We were pleading with the FDA that you should just allow us to do times relapsed rather than relapse rate at two years, because if you look at the data, we had significance at six months. We are significant at 12 months; we have significance at 18 months in favor of Apaziquone. It is at two years that we lost it. And in all cancer patients, as we were discussing with Dr. Witjes, all patients eventually will relapse.
>
> ***So this time FDA has agreed*. *They saw the problem, and they said the new protocol will allow us time to relapse rather than relapse rate at two years. So, clearly, there are subtle differences in the protocol that could have made the difference in the outcome. And we are quite expectant -- we are hoping that this will be the case in the next study***.
>
> **Witjes**: One small remark from my side. I have been to the FDA now I think around four or five times in the last 10, 15 years. And I have seen them developing from not very open for new ideas, and ***now they're really convinced that we need something new in this field***. ***So they are really thinking with a company or with us to change this field of treatment, because there is really unmet need there***.

> **Pantginis**: And I just wanted to be clear. I know you mentioned potential subpopulations. Can you identify what those might be? Is that beyond bleeders, or did I mishear?
>
> **Witjes**: No, no, I think you could use this for all patients. It's just that we decided to test the drug initially in this subgroup of patients with this instillation schedule, but I'm sure you can use this in all non-muscle-invasive bladder cancer patients. No doubt about that. We did smaller trials in other patients who I had also inspected.
>
> Pantginis: And then just, too, with Apaziquone, to finish up: with the coming Phase III study, will you have any restrictions on background therapy -- say for cardiovascular, say, coumadins, or blood thinners, or what have you?
> Witjes: No, I don't think so. (Emphasis added).

97. The foregoing statements during the March 13, 2015 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

98. On March 13, 2015, Defendants filed with the SEC the Company's annual report on Form 10-K for the year ended December 31, 2014 ("2014 10-K").[16]

---

[16] Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, on Exhibit 32.1, appended to the 2014 10-K, Defendants Shrotriya and Gustafson certified that, to his knowledge, the 2014 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Report fairly presents in all material respects the financial condition and results of operations of Spectrum Pharmaceuticals, Inc." In addition, on Exhibit 31.1, appended to the 2014 10-K, Defendants Shrotriya and Gustafson each also certified "based on his knowledge," that the 2014 10-K contained no "untrue statement of a material fact or omit to state a material fact necessary to make

Defendants Shrotriya and Gustafson signed the 2014 10-K. In the 2014 10-K, after describing Apaziquone, Defendants stated that "[w]e expect to prepare and submit a NDA with the FDA for APAZIQUONE in the fourth quarter of 2015."[17]

99. The foregoing statements in the 2014 10-K were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

100. On May 7, 2015, Defendants issued a press release, summarizing the Company's results for the quarter ended March 31, 2015. In that press release, about apaziquone, Defendants stated:

> Apaziquone, a potent prodrug for non-muscle invasive bladder cancer: ***Statistically significant results presented from an integrated analysis of two completed Phase 3 studies***; NDA submission planned this year
>
> ***
>
> We are making progress towards filing an NDA for Apaziquone, which targets a disease with high unmet need. (Emphasis added).

101. The foregoing statements in the May 7, 2015 press release were materially false and misleading because Defendants knew or recklessly disregarded that by the

---

the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

[17] 2014 10-K at 8.

beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

102. On May 7, 2015, Defendants convened a conference call to discuss the Company's results for the quarter ended March 31, 2014 that they had summarized in a May 7, 2015 press release. During their prepared remarks, about apaziquone, Defendants stated:

> **Shrotriya**: We are looking forward to 2015 as it should be a pivotal year for several drugs in our pipeline. Today, I would like to focus on our 4 most exciting pipeline assets:
>
> ***
>
> Third, we're making progress in apaziquone, a potent, tumor-activated pro-drug for bladder cancer. There is a high unmet need in non-muscle-invasive bladder cancer, and apaziquone has shown promising data in a previous Phase III program. In consultation with the FDA, we are now finalizing a protocol for an additional clinical trial. And soon after initiating the trial, we plan to file an NDA with the FDA before the end of this year.
>
> ***
>
> **Turgeon**: Also, we plan to file another NDA this year for apaziquone. This is an area of significant unmet medical need and there's been no new product approved in the last 40 years.
>
> ***
>
> **Allen**: Finally, let me talk about apaziquone, our tumor-activated pro-drug for the treatment of non-muscle invasive bladder cancer. At our Analyst Day, you heard how excited a leading urologist, Dr. Fred Witjes, was about apaziquone as potential benefit for patients with this disease who have a significant, unmet medical need. ***The analysis of integrated data from 2 completed clinical trials has demonstrated statistically significant increases in 2 year recurrence rates.***

> ***We have discussed these data with the FDA and are well on our way with preparing our NDA submission this year. This submission will be made following the initiation of an additional study as was discussed with the FDA***. As Joe mentioned, there's is a dearth of new therapies, and apaziquone has the potential to be the first new drug approved to treat non-muscleinvasive bladder cancer in more than 40 years. (Emphasis added).

103. Also during the May 7, 2015 conference call, in colloquy with analyst Reni J. Benjamin or H.C. Wainright & Co., Defendants stated:

> **Benjamin**: And just switching gears to another program, apaziquone, what does that I know you're finalizing the protocol, can you give us any sort of sense as to how that trial is likely to shape up, maybe how big and how long it could take?
>
> **Shrotriya**: So Ren, you have followed apaziquone for a long time, and so I'll just give you the highlights of the trial. ***You remember the last trial, the end point of the trial was relapsed rate at 2 years. And when you look at the data of 2 years, we missed significance in each of those 2 studies, which were 500 patient trials. But when you combine the 2 studies, the data was highly significant at pvalue 0.017. So we took that data, met with the FDA. And our understanding is and our decision is that we can go ahead and file the NDA with this drug, but FDA wanted us to start another trial, take all the learnings from the first 2 trials and incorporate them into the new protocol***. For example, if you -- when we look at our analysis of the earlier trials, we did not see significance at 2 years, ***but data was highly significant at 18 months, 12 months, 6 months, so one of the major change in the protocol for the next for the new trial is that we are looking at time to relapse rather than relapse at 2 years***. So that goes in our favor, and there are some other minor tweaks to the protocol. For example, instead of giving it once, we are now proposing to give this drug twice. So those are the 2 major things, and there are other minor considerations. However, I have to tell you that about 80 to 90 centers that participated in this trial, in earlier trials in Canada, in U.S., they're all excited and ready to work with this new protocol.
>
> **Benjamin**: And anything further one of the things that we learned at the Analyst Day was what happens to the drug when blood is found, right, in the bladder. And so can you just give us some thoughts as to how the protocol may be designed to avoid that in this trial?

> **Shrotriya**: So, that's another thing we learned, is that this drug is deactivated by an enzyme that's presented in the red blood cells. So therefore, we have now decided in consultation with the FDA that patients with rank bleeding up to TUR will be excluded from the analysis. In fact, if we go back and do the retroactive analysis of the 2 completed trials, there were about 20 patients out of 500 that had frank blood. If we exclude those patients, then the data becomes significant even at 2 years. However, ***we decided that in the new protocol, we are going to our priority, write a statistical plan to exclude those patients from analysis, and FDA has agreed with that***.
>
> ***
>
> So I mean, ***we are focusing on the FDA registration at this time. We have decided that at Spectrum right now, our decision maker is FDA. We are working towards the FDA and we are paying less attention to promoting these drugs at ASCO and ASH***. So at this ASCO, there could be some paper will be presented by the investigators, but Spectrum is not sponsoring any of the representations at this ASH meeting. I mean, the ASH committee. (Emphasis added).

104. The foregoing statements during the May 7, 2015 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

105. On August 6, 2015, Defendants issued a press release, summarizing the Company's results for the quarter ended June 30, 2015. In that press release, about apaziquone, Defendants summarized, "Apaziquone: On track for NDA filing by year end" and stated with respect to the Company's "pipeline" of new drugs, "Additionally, with apaziquone, we plan to file an NDA and initiate a confirmatory Phase 3 trial under a SPA by year end."

106. The foregoing statements in the August 6, 2015 press release were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

107. On August 6, 2015, Defendants convened a conference call to discuss the Company's results for the quarter ended June 30, 2014 that they had summarized in an August 6, 2015 press release. During their prepared remarks, about apaziquone, Defendants stated:

> **Shrotriya**: Lastly, we're on track to file an NDA by the end of this year on Apaziquone, a novel drug for non-muscleinvasive bladder cancer. In addition, a confirmatory trial with Apaziquone is being pursued with the FDA through another special protocol assessment.
>
> ***
>
> **Turgeon**: Also, we plan to file another NDA by the end of the year for Apaziquone, a potent, tumor-activated prod-drug for bladder cancer. This will be our third NDA in three years. In consultation with the FDA, we are pursuing a special protocol ***assessment for confirmatory clinical trial***. Bladder cancer is an area of significant unmet medical need with no new products approved in the last 40 years.
>
> ***
>
> **Allen**: Finally, I'll talk about Apaziquone, our tumor-activated pro-drug for the treatment of non-muscleinvasive bladder cancer. As we discussed with you in our March Investor Day meeting, this remains an area with a large unmet medical need. ***Our analysis of the integrated data from the two large completed randomized Phase 3 settings with Apaziquone demonstrated a statistically significant decrease in two year recurrence rates in patients with early bladder cancer***.

> ***We have discussed these data with the FDA and are well on our way to complete the Apaziquone NDA that will be submitted in the fourth quarter of this year***. This will be the third NDA Spectrum has submitted to the Agency over the past three years.
>
> The Apaziquone submission will be made following initiation of an additional Phase 3 study that is being discussed with FDA under the special protocol assessment process. Given the lack of new therapies for these patients, Apaziquone has the potential to be the first new drug approved to treat non-muscleinvasive bladder cancer in more than 40 years. (Emphasis added).

108. Also during the August 6, 2015 conference call, in colloquy with analyst Chris Howerton of Jeffries & Co., Defendants stated:

> **Howerton**: ***And then just another quick one on Apaziquone, in terms of the FDA's review of your NDA that you plan to submit towards the end of this year, when will they review that once you have data in hand from the confirmatory trial or they start reviewing the data and potentially provide you with a PDUFA data after acceptance of that NDA***?
>
> **Shrotriya**: The FDA wants us to do a confirmatory trial. The understanding that we have is that if we're able to submit the old two trials 611, 612, that you combine, as you remember, each study alone is not significant [indiscernible] submitted with those protocols. However, when you combine those two studies, then the data becomes highly significant. So those two studies combined are going to be treated as one study and FDA wanted us to start another trial for which FDA's input has been sought and is being further solidified by this.
>
> ***The understanding is that the FDA – we can file the NDA now, but the FDA will not review it, FDA will send it to DAC, but will not send it until we have included enrolled majority of the patients in the new trial. And the understanding – the FDA said that if we approve your drug now, or review your drug application now, there is no way you can complete a placebo controlled trial***.
>
> ***Let me remind you the protocol that we're now planning to do is a placebo-controlled study. And therefore to answer your question, until majority of the patients have been enrolled into this trial, the NDA will not be – the ODAC meeting will not be held, I'm sure at the end some review at the FDA will continue***. (Emphasis added).

109. The foregoing statements during the August 6, 2015 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

110. On November 4, 2015, Defendants issued a press release, summarizing the Company's results for the quarter ended September 30, 2015. In that press release, about apaziquone, Defendants summarized that the Company was "[o]n track for apaziquone NDA filing by year end ***based on previous Phase 3 studies***; additional Phase 3 trial initiated under SPA." Defendant Shrotriya stated, "[b]efore the end of this year, we look forward to filing the NDA for our bladder cancer drug apaziquone. . . ." In addition, the Company stated:

> Apaziquone, a potent tumor-activated pro-drug for non-muscle invasive bladder cancer: By year end, ***Spectrum expects to file the NDA based on the previous Phase 3 studies***. The Company has also initiated enrollment in an additional randomized, placebo-controlled Phase 3 trial under the SPA agreement, and treated the first patient in late October. This Phase 3 study has been specifically designed to address important lessons learned from the previous apaziquone Phase 3 studies, as well as recommendations made by the FDA.

111. The foregoing statements in the November 4, 2015 press release were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which

Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

112. On November 4, 2015 at 4:30 p.m. EST, Defendants convened a conference call to discuss the Company's results for the quarter ended September 30, 2014 that they had summarized in a November 4, 2015 press release. During their prepared remarks, about apaziquone, Defendants stated:

> **Shrotriya**: Moving on to apaziquone, our drug for non-muscle invasive bladder cancer, we recently gained agreement with the FDA on an additional Phase 3 trial for apaziquone under the SPA. Last week, we announced that we initiated this trial and have treated first patient. We're looking forward to filing the apaziquone NDA before the end of this year, based on previously completed Phase 3 studies.
>
> ***
>
> **Turgeon**: In addition, the team is currently working on filing the NDA for apaziquone, our potent tumor-activated pro-drug for bladder cancer. We're happy to announce our first patient was enrolled in our Phase 3 trial at the end of October, under an SPA agreement with the FDA. Dr. Allen will provide more details around the trials shortly.
>
> The overall cost for treatment of bladder cancer in the U.S. is a staggering $3.4 billion annually, and most of this cost is related to direct treatment of the disease. We're hopeful that we can get this drug to market as soon as possible to meet the significant unmet medical need.
>
> ***
>
> **Allen**: ***I am also pleased to report that the NDA for apaziquone, our tumor our activated prodrug for treatment of non-muscle invasive bladder cancer, is on track for submission this year using data from the two previously completed Phase 3 studies***.
>
> As Joe mentioned, we recently started the additional Phase 3 trial that was agreed to with FDA under special protocol assessment. We have now treated the first patient in the study and have several patients currently being screened for enrollment. The lack of new therapies for patients with non-

> muscle invasive bladder cancer highlights the important unmet medical needs for these patients. (Emphasis added).

113. The foregoing statements during the November 4, 2015 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness.

114. On December 16, 2015, the Company filed with the SEC a current report on Form 8-K, stating that on December 11, 2015, Spectrum had submitted its NDA for apaziquone.

115. On February 19, 2016, Defendants issued a press release, stating:

> Spectrum Pharmaceuticals (NasdaqGS: SPPI), a biotechnology company with fully integrated commercial and drug development operations with a primary focus in Hematology and Oncology, announced that ***the U.S. Food and Drug Administration (the "FDA") has accepted the EOquin (apaziquone for intravesical instillation) New Drug Application (NDA) for review***. ***The FDA also indicated that it plans to hold an advisory committee meeting regarding the NDA***. The FDA has set a target action date under the Prescription Drug User Fee Act (PDUFA) of December 11, 2016. (Emphasis added).

116. The foregoing statements in the February 19, 2016 press release were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did

not support apaziquone's effectiveness. By the time that Defendants submitted the NDA in December, 2015, Defendants also knew or recklessly disregarded that as of the date they filed the apaziquone NDA they had accumulated and included no additional data from that available to them in December, 2012 and that, from the FDA's point of view, nothing had changed in terms of the unacceptability of the pooled data Defendants submitted in support of the NDA.

117. On March 9, 2016, Defendants issued a press release, summarizing the Company's results for the quarter and fiscal year ended December 31, 2015. In that press release, about apaziquone, to which Defendants now referred as EOquin, Defendants stated:

> EOquin (apaziquone for intravesical instillation), a potent tumor-activated drug for non-muscle invasive bladder cancer: Spectrum filed an NDA and the company received a PDFUA date of December 11, 2016.
>
> ***
>
> EOquin, a potent tumor-activated drug for non-muscle invasive bladder cancer: ***Spectrum filed an NDA based on the previous Phase 3 studies. The FDA accepted the NDA and has given Spectrum a PDUFA date of December 11, 2016***. The FDA also indicated that it plans to hold an advisory committee meeting regarding the NDA. The Company is actively enrolling an additional randomized, placebo-controlled Phase 3 trial under the SPA agreement. The Phase 3 study has been specifically designed to build on learnings from the previous EOquin Phase 3 studies, as well as recommendations from the FDA. (Emphasis added).

118. The foregoing statements in the March 9, 2016 press release were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support

approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness. By the time that Defendants submitted the NDA in December, 2015, Defendants also knew or recklessly disregarded that as of the date they filed the apaziquone NDA they had accumulated and included no additional data from that available to them in December, 2012 and that, from the FDA's point of view, nothing had changed in terms of the unacceptability of the pooled data Defendants submitted in support of the NDA.

119. On March 9, 2016 at 4:30 p.m. EST, the Company convened a conference call to discuss the Company's results for the quarter and fiscal year ended December 31, 2015 that they had summarized in their March 9, 2016 press release. During their prepared remarks, about apaziquone, Defendants stated, in relevant part:

> **Shrotriya**: A few days ago, we started an important Phase 2 trial assessing Poziotinib's potential in breast cancer patients who have very few options left. ***A few words about EOquin, which was also called apaziquone a bladder cancer drug which, if approved, could serve an area of significant unmet medical need. We expect an advisory panel and FDA decision later this year in December 2016***.
>
> ***
>
> In summary, our pipeline with exciting drugs that address large markets is rapidly advancing. Our commercial operations are strong and our cash position is solid. Our key drugs in development SPI2012 and Poziotinib have shown good clinical data that target large markets and provide us with multiple shots and goal. ***We also have two drugs pending in FDA approval decision this year; EVOMELA in May, and EOquin in December. We look forward to updating you on our progress as the time passes***.
>
> ***
>
> **Turgeon**: Now, let me talk about EOquin, our potent tumor-activated drug for bladder cancer. Just last month, we received communication from the FDA that they have accepted our NDA filing and provided us with a PDUFA date of December 11, 2016. The FDA also indicated that it plans to hold an advisory committee meeting regarding this NDA. (Emphasis added).

120. Also during the March 9, 2016 conference call, in colloquy with analyst Swayampakula Ramakanth of H.C. Wainright, Defendants stated, in relevant part:

> **Ramakanth**: Okay. And then on the EOquin, certainly, FDA has provided you with a PUDFA date of December 11, 2016. And will there be any possibility of interim data by that date? And also what's the possibility that FDA could decide to wait for the completion of this study before giving you a final decision?
>
> **Shrotriya**: So if I understand your question, it's about EOquin, apaziquone, a bladder cancer drug, ***whether the FDA is likely to wait for the current trial – ongoing trial to be completed. That's a question that I can't really answer as you know. We have submitted data based on three things. Number one, we know that our drug is active based on not only the market lesion is very impressive that you leave a tumor behind, and the only thing you give to these patients is give a single dose of EOquin and 69% patients had complete responses***.
>
> ***And then the Phase 3 trials that we did 611/612, we saw the drug was extremely safe. And for the technical reasons we have done reanalysis. We have submitted to the FDA. As you know that we – when we studied, each study was not positive, pvalue was not less than 0.05. However, when we combine the two trials then the study data was highly significantly positive***.
>
> In this unmet medical need, no drug has been approved in the space. And when we talk to experts, we believe that the – that this unmet medical need, in fact, the only other drug that is used in Europe, for example, is Mitomycin and in some of the centers. And Mitomycin is, as you know, causes sloughing of the two –of the healthy tissues. So urologists are very afraid to give a drug like Mitomycin, which is very toxic. As compared to that in our experience of treating now two – conducting two large studies with over 600 patients each, we found that our drug is relatively safe and we feel good about it. (Emphasis added).

121. The foregoing statements during the March 9, 2016 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which

Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness. By the time that Defendants submitted the NDA in December, 2015, Defendants also knew or recklessly disregarded that as of the date they filed the apaziquone NDA they had accumulated and included no additional data from that available to them in December, 2012 and that, from the FDA's point of view, nothing had changed in terms of the unacceptability of the pooled data Defendants submitted in support of the NDA.

122. On March 14, 2016, the Company filed with the SEC its annual report for the year ending December 31, 2015 on Form 10-K ("2015 10-K").[18] Defendants Shrotriya and Gustafson signed the 2015 10-K. Referring to apaziquone as one of its "two drugs in late stage development,"[19] in the 2015 10-K, Defendants stated:

> In August 2015, we reached agreement with the FDA on the Special Protocol Assessment ("SPA") of the planned Phase 3 clinical trial of EOQUIN. This trial commenced with its first patient dosing in October 2015, and is designed to evaluate the intravesical use of this drug for the treatment of patients with NMIBC as one or two instillations, immediately following transurethral resection of bladder tumor

---

[18] Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, on Exhibit 32.1, appended to the 2015 10-K, Defendants Shrotriya and Gustafson certified that, to his knowledge, the 2015 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Report fairly presents in all material respects the financial condition and results of operations of Spectrum Pharmaceuticals, Inc." In addition, on Exhibit 31.1, appended to the 2015 10-K, Defendants Shrotriya and Gustafson each also certified "based on his knowledge," that the 2015 10-K contained no "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

[19] 2015 10-K at 44.

> ("TURBT"). ***In December 2015, we submitted our NDA for EOQUIN with the FDA, based on the pooled results of a previous Phase 3 program. In February 2016, the FDA accepted the EOQUIN NDA for review and indicated that it plans to hold an advisory committee meeting regarding the NDA and set a target decision date of December 11, 2016***. (Emphasis added).[20]
>
> ***
>
> EOQUIN (formerly referred to as APAZIQUONE): In August 2015, we reached agreement with the FDA on the SPA of the planned Phase 3 clinical trial of EOQUIN. This trial commenced with its first patient dosing in October 2015 and is designed to evaluate the intravesical use of this drug for the treatment of patients with non-muscle invasive bladder cancer (NMIBC) as one or two instillations, immediately following transurethral resection of bladder tumor (TURBT). Due to the high rate of recurrence for NMIBC, there is a significant unmet medical need and the overall cost of bladder cancer treatment in the U.S. is $3.4 billion annually, most of which is related to the direct treatment of this disease. Accordingly, this drug represents much-needed therapy for patients and provides a meaningful opportunity to reduce overall medical costs. ***In December 2015, we submitted our NDA for EOQUIN with the FDA, and in February 2016, the FDA communicated its acceptance of this NDA with a target decision date of December 11, 2016***.[21] (Emphasis added).

123. The foregoing statements in the 2015 10-K were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness. By the time that Defendants submitted the NDA in December, 2015,

[20] 2015 10-K at 6-7.

[21] 2015 10-K at 45.

Defendants also knew or recklessly disregarded that as of the date they filed the apaziquone NDA they had accumulated and included no additional data from that available to them in December, 2012 and that, from the FDA's point of view, nothing had changed in terms of the unacceptability of the pooled data Defendants submitted in support of the NDA.

124. On May 5, 2016, Defendants issued a press release, summarizing the Company's results for the quarter ended March 31, 2016. About Apaziquone, Defendants stated that the "FDA accepted NDA and assigned a PDFUA [sic] date of December 11, 2016." Defendants Shrotriya stated that Defendants "expect[ed] a response from the FDA on the NDA for apaziquone later this year." In their "pipeline update," Defendants stated that:

> The FDA accepted the NDA and has given Spectrum a PDUFA date of December 11, 2016. The FDA also indicated that it plans to hold an advisory committee meeting regarding the NDA. The Company is actively enrolling an additional randomized, placebo-controlled Phase 3 trial under an SPA agreement. The Phase 3 study has been specifically designed to build on learnings from the previous studies, as well as recommendations from the FDA.

125. The foregoing statements in the May 5, 2016 press release were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness. By the time that Defendants submitted the NDA in December, 2015, Defendants also knew or recklessly disregarded that as of the date they filed the apaziquone NDA they had accumulated and included no additional data from that

available to them in December, 2012 and that, from the FDA's point of view, nothing had changed in terms of the unacceptability of the pooled data Defendants submitted in support of the NDA.

126. On May 5, 2016 at 4:30 p.m. EDT, the Company convened a conference call to discuss the Company's results for the quarter ended March 31, 2016 that they had summarized in their May 5, 2016 press release. During their prepared remarks, about apaziquone, Defendants stated, in relevant part:

> **Shrotriya**: As you know, we are expecting an advisory panel and an FDA decision on apaziquone NDA for treating bladder cancer by December 11 of this year.
>
> ***
>
> **Turgeon**: Lastly, let me talk about apaziquone, our potent tumor activated drug for bladder cancer. In the first quarter, [t]he FDA accepted our IND filing and provided us with a PDUFA date of December 11, 2016. The FDA also indicated that it plans to hold an advisory committee meeting regarding the NBA [ph].
>
> Our team is already preparing for that advisory committee meeting. Overall the first quarter has been productive and we keep progressing our late stage pipeline. We are focused on developing three drugs that target large indications such as breast cancer and bladder cancer. I am really enthusiastic about our portfolio of late stage drugs. If any of these drugs are successful it could transform spectrum as we know it today. We remain focused on the goals ahead and look forward to updating you on our progress.

127. Also during the May 5, 2016 conference call, in colloquy with analyst Christopher Howerton of Jeffries, LLC, Defendants stated, in relevant part:

> **Howerton:** Hi thanks for taking the questions. I guess just most of my questions were answered in the call and other questions, but in terms of the upcoming expected advisory committee for apaziquone and of course the PDUFA following that. What are your expectations in terms of the sensitivities around the data and your confidence in terms of their being a positive discussion with the committee and regulators?

> **Shrotriya:** ***Well, clearly we are very excited about the data we have submitted to the FDA. It is because of our excitement. It is because we are convinced the drug is safe and effective that we have put together the NDA and we are very pleased that the FDA has accepted it for review and have now given us a PDUFA date. So these are all exiting for us, exciting times for the drug; however, much will depend on the PDUFA date and I have no idea how the PDUFA, I mean the ODAC Panel will.***
>
> One of my concerns has always been that the ODAC Panel consists of oncologists. However, apaziquone is a drug that is to be used by urologists and urologists are the ones who treat bladder cancer. So time will tell. I am hoping that the ODAC Panel will see what we are seeing that the drug is safe and effective and there is unmet medical need. Don't forget in the last 40 years no drug has been approved for non-muscle invasive bladder cancer. There is definite unmet medical need. So we are being quite excited about the data and about the upcoming ODAC Panel and PDUFA date. (Emphasis added).

128. The foregoing statements during the May 5, 2016 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness. By the time that Defendants submitted the NDA in December, 2015, Defendants also knew or recklessly disregarded that as of the date they filed the apaziquone NDA they had accumulated and included no additional data from that available to them in December, 2012 and that, from the FDA's point of view, nothing had changed in terms of the unacceptability of the pooled data Defendants submitted in support of the NDA.

129. On May 6, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2016.[22] Defendants Gustafson signed the May 6, 2016 10-Q. That Form 10-Q discussed the Company's progress with respect to apaziquone, stating in relevant part:

> APAZIQUONE: In August 2015, we reached agreement with the FDA on the SPA of the planned Phase 3 clinical trial of APAZIQUONE. This trial commenced with its first patient dosing in October 2015, and is designed to evaluate the intravesical use of this drug for the treatment of patients with non-muscle invasive bladder cancer ("NMIBC") as one or two instillations, immediately following transurethral resection of bladder tumor ("TURBT"). Due to the high rate of recurrence for NMIBC, there is a significant unmet medical need and the overall cost of bladder cancer treatment in the U.S. is $3.4 billion annually, most of which is related to the direct treatment of this disease. Accordingly, this drug represents much-needed therapy for patients and provides a meaningful opportunity to reduce overall medical costs. ***In December 2015, we submitted our NDA for APAZIQUONE with the FDA, and in February 2016, the FDA communicated its acceptance of this NDA with a target decision date of December 11, 2016***. (Emphasis added).

130. The foregoing statements in the May 6, 2016 10-Q were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA

[22] Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, on Exhibit 32.1, appended to the May 6, 2016 Form 10-Q, Defendants Shrotriya and Gustafson certified that, to his knowledge, the May 6, 2016 Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Report fairly presents in all material respects the financial condition and results of operations of Spectrum Pharmaceuticals, Inc." In addition, on Exhibit 31.1, appended to that 10-Q, Defendants Shrotriya and Gustafson each also certified "based on his knowledge," the 10-Q contained no "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness. By the time that Defendants submitted the NDA in December, 2015, Defendants also knew or recklessly disregarded that as of the date they filed the apaziquone NDA they had accumulated and included no additional data from that available to them in December, 2012 and that, from the FDA's point of view, nothing had changed in terms of the unacceptability of the pooled data Defendants submitted in support of the NDA.

131. On July 13, 2016, the Company published its 2016 Corporate Presentation. In the Presentation included a slide about apaziquone which stated, "Filed NDA with pooled data from previous Phase 3 studies."

132. The foregoing statement in the July 13, 2016 Corporate Presentation was materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness. By the time that Defendants submitted the NDA in December, 2015, Defendants also knew or recklessly disregarded that as of the date they filed the apaziquone NDA they had accumulated and included no additional data from that available to them in December, 2012 and that, from the FDA's point of view, nothing had changed in terms of the unacceptability of the pooled data Defendants submitted in support of the NDA.

133. On August 9, 2016, Defendants issued a press release, summarizing the Company's results for the quarter ended June 30, 2016. With respect to apaziquone, Defendants stated, "Qapzola™ (apaziquone) advisory panel scheduled on September 14, 2016, and FDA decision expected on December 11, 2016." The press release quoted Defendants Shrotriya as stating that "Qapzola for postsurgical treatment of non-muscle invasive bladder cancer is under FDA review and we look forward to presenting our case to an FDA advisory panel next month. We are making advances in our pipeline that could lead to novel cancer therapies that would benefit both patients and shareholders." Last, in a "Pipeline Update," Defendants stated:

> Qapzola, a potent tumor-activated drug being investigated for non-muscle invasive bladder cancer: The FDA is expected to make a decision on Qapzola' s approval by the PDUFA date of December 11, 2016. The FDA plans to hold an advisory committee meeting on September 14, 2016. The Company is actively enrolling an additional randomized, placebo-controlled Phase 3 trial under a SPA agreement. The Phase 3 study has been specifically designed to build on learnings from the previous studies, as well as recommendations from the FDA.

134. The foregoing statements in the August 9, 2016 press release were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness. By the time that Defendants submitted the NDA in December, 2015, Defendants also knew or recklessly disregarded that as of the date they filed the apaziquone NDA they had accumulated and included no additional data from that available to them in December, 2012 and that, from the FDA's

point of view, nothing had changed in terms of the unacceptability of the pooled data Defendants submitted in support of the NDA.

135. On August 9, 2016, Defendants filed with the SEC the Company's quarterly report on Form 10-Q for the quarter ended June 30, 2016.[23] Defendant Gustafson signed the August 9, 2016 10-Q. That 10-Q discussed the Company's progress with respect to apaziquone, stating in relevant part:

> QAPZOLA (formerly referred to as APAZIQUONE), a potent tumor-activated drug being investigated for non-muscle invasive bladder cancer: The FDA accepted the NDA and has given Spectrum a PDUFA date of December 11, 2016. The FDA plans to hold an advisory committee meeting regarding the NDA on September 14, 2016. The Company is actively enrolling an additional randomized, placebo-controlled Phase 3 trial under an SPA agreement. The Phase 3 study has been specifically designed to build on learnings from the previous studies, as well as recommendations from the FDA.

136. The foregoing statements in the August 9, 2016 10-Q were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed

[23] Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, on Exhibit 32.1, appended to the August 9, 2016 Form 10-Q, Defendants Shrotriya and Gustafson certified that, to his knowledge, the August 9, 2016 Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Report fairly presents in all material respects the financial condition and results of operations of Spectrum Pharmaceuticals, Inc." In addition, on Exhibit 31.1, appended to that 10-Q, Defendants Shrotriya and Gustafson each also certified "based on his knowledge," that that 10-Q contained no "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness. By the time that Defendants submitted the NDA in December, 2015, Defendants also knew or recklessly disregarded that as of the date they filed the apaziquone NDA they had accumulated and included no additional data from that available to them in December, 2012 and that, from the FDA's point of view, nothing had changed in terms of the unacceptability of the pooled data Defendants submitted in support of the NDA.

137. On August 9, 2016 at 4:30 p.m. EDT, Defendants convened a conference call to discuss the Company's results that they had summarized in the August 9, 2016 press release. About apaziquone, Defendant Turgeon stated:

> Lastly, let me talk about QAPZOLA, also known as apaziquone, our potent tumor-activated drug for bladder cancer. This Phase 3 data from QAPZOLA was presented at an oral presentation at the 2016 annual AUA meeting in May. There are a couple of important milestones for this drug later this year.
>
> First, we have an FDA Advisory Panel on September 14, and we are currently preparing for that Advisory Panel meeting. We have engaged with experts in the field of urology to assist us in this important endeavor. The FDA is expected to make a decision on the approval of this drug by the PDUFA date of December 11, 2016.

138. Also during the call, Defendants discussed the FDA approval process for apaziquone. In colloquy with analyst Adnan Butt of RBC Capital Markets, Defendants stated:

> **Butt**: Thank you. A couple of pipeline questions, and then maybe a question for Kurt as well. So first on apaziquone, could you tell us the FDA's review timeline or FDA's approval decision, is that contingent upon achieving a certain enrollment in the ongoing Phase 3 study?

> **Shrotriya**: So Adnan, thank you for your question. ***To best of my knowledge and understanding the FDA's decision will be based on the application that we have filed, NDA, rather than on the ongoing study***. (Emphasis added).

139. The foregoing statements during the August 9, 2016 conference call were materially false and misleading because Defendants knew or recklessly disregarded that by the beginning of the Class Period, the FDA had advised Defendants not to submit an NDA for apaziquone based on then existing results of clinical trials. The FDA also informed Defendants in December, 2012, that the pooled data on which Defendants relied—and that they touted to the public—was insufficient to support approval of apaziquone because that data was not part of the prespecified SAP and did not support apaziquone's effectiveness. By the time that Defendants submitted the NDA in December, 2015, Defendants also knew or recklessly disregarded that as of the date they filed the apaziquone NDA they had accumulated and included no additional data from that available to them in December, 2012 and that, from the FDA's point of view, nothing had changed in terms of the unacceptability of the pooled data Defendants submitted in support of the NDA.

**THE TRUTH EMERGES**

140. On September 14, 2016 at 1:06 p.m. EDT, Spectrum issued a press release, titled *FDA Advisory Committee Votes that Qapzola™ (apaziquone) Has Not Shown Substantial Evidence of a Treatment Effect Over Placebo*, stating in relevant part:

> Spectrum Pharmaceuticals (NasdaqGS: SPPI), a biotechnology company with fully integrated commercial and drug development operations with a primary focus in Hematology and Oncology, announced today that ***the U.S. Food and Drug Administration (FDA) Oncologic Drugs Advisory Committee (ODAC) voted that Qapzola for immediate intravesical instillation post-transurethral resection of bladder tumors (post-TURBT) has not shown substantial evidence of a treatment effect over placebo in patients with non-muscle invasive bladder cancer (NMIBC).***

> The committee recommendation is not binding on the FDA, which makes the final decision on approval. The Prescription Drug User Fee Act (PDUFA) date for the Qapzola NDA is December 11, 2016. (Emphasis added).

141. On the same date, the FDA published the FDA's Briefing Document from Oncologic Drugs Advisory Committee Meeting on Spectrum's Qapzola/ apaziquone NDA on its website, which stated that the Company was aware of faulty data it submitted in the NDA back in 2012, stating in relevant part:

> ***In December 2012, the Agency noted that both 611 and 612 did not meet the pre-specified criteria for superiority when compared to placebo and that the pooled analysis, using data from both studies, was done post-hoc and was not part of the statistical plan. The Agency discouraged the Applicant from submitting a NDA and questioned whether the effect size was clinically meaningful***. (Emphasis added).

142. On this news, shares of Spectrum fell $0.45 per share or over 8% from its previous day's closing price to close at $5.04 per share on September 14, 2016, on unusually heavy volume of 2,368,300 shares traded. On that same day, the NASDAQ Biopharma Index (NASDAQ: IBB), of which Spectrum is a component, rose 1.2% and the NASDAQ Composite Index remained unchanged, rising slightly by 0.004.

143. On September 16, 2016 at 11:47 a.m., EDT, *TheStreet.com* published an article by Adam Feuerstein entitled *Spectrum Pharma, FDA and the Buried Truth About a Bladder Cancer Drug Meeting*. The article discussed how Defendants hid a meeting with the FDA, stating in relevant part:

> **Spectrum Pharmaceuticals** (**SPPI**) hid from investors a key detail of a meeting with the U.S. Food and Drug Administration in which regulators told the company not to seek approval for a bladder cancer drug because two clinical trials failed to benefit patients.
>
> The FDA's advice was ignored. Spectrum submitted a new drug application for apaziquone as a treatment for bladder cancer. On Wednesday, a panel of outside experts convened

by the FDA reviewed the apaziquone clinical data and decided unanimously the drug did not warrant approval.

The FDA will almost certainly follow the panel's recommendation and reject Spectrum's drug.

***The meeting during which FDA told Spectrum not to file a new drug application for apaziquone took place in December 2012***. Federal law prohibits the FDA from disclosing what's discussed at these closed-door meetings. Drug companies are under no such restrictions.

In a perfect world, drug companies provide investors with a fully transparent and accurate summary of FDA meetings. Unfortunately, and all too often, drug companies give investors information about FDA interactions that emphasizes the good and filters out the bad. Investors are kept in the dark about FDA concerns or warnings until it's too late.

Spectrum falls into the latter category.

In May 2015, Spectrum CEO Rajesh Shrotriya was asked by an analyst on a quarterly investor conference call for an update on apaziquone. The company had previously told investors about its intention to seek FDA approval despite two phase III studies failing to achieve their primary endpoints.

"So we took that data, met with the FDA," Shrotriya said in response to the analyst's question. "And our understanding is and our decision is that we can go ahead and file the NDA with this drug, but FDA wanted us to start another trial, take all the learnings from the first two trials and incorporate them into the new protocol."

But that's was not a fully truthful summary of the FDA's guidance to Spectrum.

Here's how FDA recounted its December 2012 meeting with Spectrum, disclosed Wednesday during the apaziquone advisory panel meeting.




***The FDA told Spectrum not to file a new drug application for apaziquone during the December 2012 meeting.***

Why did Spectrum hide this FDA recommendation from investors?

"I am not aware of all the discussions that happen with the FDA, but I am sure our regulatory department has several ongoing discussions and negotiations with the FDA," Spectrum Vice President for Strategic Planning Shiv Kapoor told me via email Thursday. "Like every company in our sector, we do not disclose every discussion with the FDA." In March 2015, the Securities and Exchange Commission's top enforcement official, Andrew Ceresney, told a gathering of pharma executives to be more transparent about their dealings with the FDA.

"Accuracy of reporting in your dealings with the FDA is critical to getting investors the information they need," Ceresney said during his speech. He later recounted three cases in which the SEC investigated and charged drug companies for lying to investors about their interactions with the FDA.

In June 2015, an FDA analysis found that drug companies routinely fail to fully inform the public about their communications with the agency. The FDA analysis, published in the British Medical Journal, concluded that

> some of the publicly disseminated explanations companies offer for why FDA rejected a drug are misleading or lies.
>
> Spectrum joins an unacceptably long list of drug and biotech companies hurting investors by failing to be fully transparent about their communications with the FDA.
>
> Amgen (AMGN) has refused to tell investors why the FDA rejected its thyroid drug in August. Imclone Systems misled investors for years by not disclosing FDA concerns about the design of studies involving the cancer drug Erbitux. Sarepta Therapeutics, Clovis Oncology, Hemispherx Biopharma, the Genzyme unit of Sanofi, Map Pharma and Introgen Therapeutics have all run into trouble over FDA communication issues.
>
> I'll repeat what I wrote in March 2015 because it's still valid: The SEC needs to follow through by making it a priority to police drug companies to make sure that disclosures about FDA matters are truthful. More phone calls, more investigations, would serve as a deterrent. Let's empower FDA to be more vocal about regulatory matters, especially when it learns companies are shading the truth. At the very least, the SEC and FDA should establish a clear line of communication to facilitate fact checking. (Emphasis added).

144. On this news, shares of Spectrum common stock closed down that day at $4.82 on unusually heavy trading volume of 2,378,500 shares, for a total share price decline since the close on September 13, 2016 of $0.67 per share or over 12%, damaging investors. Over the same three days, NASDAQ Biopharma index rose by 1.9%, the NASDAQ Composite index rose by 1.7% both over their closing on September 13, 2016. Over the next 90 trading days after September 16, 2016 close, Spectrum shares had an average daily closing price of $4.33.

145. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

146. The FDA's presentation during the September 14, 2016 ODAC meeting was devastating. Presenting for the FDA, in her opening remarks, Dr. Chana Weinstock, medical officer for the Genitourinary Cancers Team, stated:

Members of the advisory committee, colleagues, ladies and gentlemen, my name is Chana Weinstock, and I'm going to outline the agency's concerns with the apaziquone new drug application, or NDA.

The agency recognizes that non-muscle invasive bladder cancer is an area in which drug development has historically been difficult and in which there have been no recent drug approvals. We remain committed to working with industry to develop effective new drugs in this area.

Shown here is the trial design for two large, randomized, placebo-controlled trials of apaziquone, a drug chemically related to mitomycin. Apaziquone was used as a single intravesical instillation post-transurethral resection of bladder tumors in patients with non-muscle invasive bladder cancer.

The primary analysis population is shown of patients with stage 2A, grades 1 to 2 tumors, by central pathology review, with the caveat that at the time of instillation, results of central pathology review were not yet available to each investigator. The primary endpoint was recurrence rate at two years.

The regulatory background of apaziquone is as follows. In 2007, a Special Protocol Assessment Agreement, or SPA, was given by the division for a trial of a single instillation of intravesical apaziquone following TURBT. Sample size and trial endpoints were agreed upon between the applicant and the FDA. A second study was designed to be almost identical to the study 1 under SPA. Both 2 studies failed to meet their primary endpoint of an improvement in 2-year recurrence.

***In December 2012, the applicant presented a pooled analysis of the two trials that showed an approximately 6 percent decrease in the 2-year recurrence rate of bladder cancer on the apaziquone versus the placebo arms, and proposed to use these data to support an NDA submission***.

***The FDA informed the applicant that since the pooling was not pre-specified, it would not be acceptable to support an approval. The FDA advised the applicant not to submit an NDA, and that if they did, a public ODAC discussion would be required***.

***The sponsor submitted their NDA three years later, in December 2015. The division agreed to file the application, but reiterated that nothing had changed in terms of the acceptability of these data, and that a public ODAC discussion would be required, which is the purpose of our gathering today***.

> So when reviewing data submitted such as these, what are the statutory requirements guiding FDA decision-making related to drug approval? Statutory obligations require us to look for substantial evidence that a treatment effect has been identified, and is not due to variability in the underlying disease, bias, or chance alone.
>
> This treatment effect is generally demonstrated through well-controlled, and well conducted investigations. By law, sound evidence of effectiveness is a crucial component of the agency's benefit-risk assessment of a new product, otherwise we could be in danger of essentially approving a placebo.
>
> In light of this, we present two major issues for the committee to consider. First regarding efficacy, is there substantial evidence of a treatment effect demonstrated in the data presented? ***There are several reasons we question whether substantial evidence of efficacy has been demonstrated. Trial 611 and 612 both failed to meet their primary efficacy objectives. The confidence interval around the observed approximately 6 percent difference between arms did not exclude zero, meaning that we cannot rule out the possibility that the effect of apaziquone is less than that of placebo***.
>
> ***The post hoc pooling strategy used to obtain a nominal p-value is problematic, as this was not adopted prospectively, and there is a danger that the observed approximately 6 percent difference between arms could be due to chance alone***.
>
> The post hoc subgroup analysis that attempted to demonstrate an optimized instillation time of greater than 30 minutes post-procedure is considered hypothesis-generating only. ***There is enough missing data in each study at the 2-year cystoscopy mark to lead to an approximately 20 percent overall rate of missing data, which is greater than the approximately 6 percent difference in 2-year recurrence rate between arms. This brings into question the reliability of the 6 percent difference, and would also be expected to affect secondary trial endpoints, such as time to recurrence***.
>
> The second major question to consider, if and only if you do think that a substantial evidence of a treatment effect has been demonstrated, is this effect clinically meaningful?
>
> The approximately 6 percent difference in 2-year recurrence between arms is smaller than expected. It is smaller than the 12 percent difference used by the applicant in their original sample size calculations, and it is smaller than the 14 percent difference in the 5-year recurrence rate seen with the use of

> available intravesicular therapy in the most recent meta-analysis.
>
> Additionally, to put into context the kind of recurrence that was actually decreased, in these trials recurrence was defined as any histologically confirmed bladder cancer. Most recurrent disease was low grade, non-muscle invasive disease. This could potentially translate into fewer transurethral resections, but would still require extensive follow-up cystoscopy. Few patients progressed to muscle invasive disease in the 2-year treatment period.
>
> These are the two major questions we would like the committee to consider when reviewing the applicant's data.
>
> To review, as the committee is presented with analyses of the submitted data, we ask for advice in evaluating the following. Please consider if substantial evidence of a treatment effect has been demonstrated. Two trials have failed to meet their primary endpoint. Strategies attempting to salvage these data by pooling two studies or by focusing on subgroup analyses are problematic.
>
> Missing data further cast doubt on the reliability of the point estimate of efficacy. If you do think an effect has been demonstrated, please also consider the clinical meaning of this effect, given the fact that it was less than expected and less than literature reports of effectiveness of available therapy, and that primarily low-grade disease was prevented.
>
> We would also like to note that there is an ongoing trial of apaziquone in non-muscle invasive bladder cancer that has been designed to address some of the hypotheses generated from study 611 and 612, including time to instillation. We await these results as well, and hope that they will demonstrate substantial evidence of a clinically meaningful effect. Thank you. (Emphasis added).

147. In response, on behalf of Spectrum, Gajanan Bhat ("Bhat") summarized the apaziquone clinical development program, including efficacy and safety results. With respect to efficacy, Bhat stated, in relevant part:

> In the next few slides I 1 will summarize the primary and secondary efficacy data in Ta G1-G2 patient populations, starting with the primary endpoint to remind you the primary endpoint was a 2-year recurrence rate.
>
> In study 611, which was a U.S. study, the relative reduction in recurrence for apaziquone or placebo was 15 percent, with

an absolute difference of 6.7 percent and an odds ratio of 0.76.

In study 612, primarily conducted outside the U.S., there was a reproducible clinically meaningful relative reduction of 14.2 percent, with an absolute difference of 6.6 percent and an identical odds ratio of 0.76. Both of these studies did not meet a statistical criteria of significance, however integrated data from two studies provided the relative reduction of 14.7 percent, which was statistically significant.

The key point here is that between studies, although conducted in different countries and different regions, there was a remarkable consistency in the primary efficacy of recurrence rate in two large studies.

Now, I will turn to a key secondary endpoint of time to recurrence, starting with study 611. The improvement in time to recurrence with apaziquone as presented using the hazard ratio was statistically significant in study 611. In study 612, although not statistically significant, a similar improvement was observed as seen from the hazard ratio.

The time to recurrence being an important endpoint in oncology studies, we have met statistical significance in one study and observed similar improvement in the other study.

Although not pre-specified in the statistical analysis plan, Spectrum has performed a pooled analysis of efficacy, both simple and stratified, and the results of the recurrence rate and time to recurrence are provided here.

We believe this was justified as the studies were nearly identical in design, evaluable populations were identical, primary endpoint was the same, all study sites were in one of the three countries, and essentially both studies started and ended at the same time.

As you can see from odds ratio from simple pooled and stratified pooled analysis, recurrence rate improvement met nominal p-value of less than 0.05. Similarly, the pooled analysis met nominal p-value of less than 0.05 for time-to-recurrence endpoint.

While the pivotal trial design was the subject of a special protocol assessment, it took a long time to put in place, as a trial design was challenging for both FDA and Spectrum. Some of the challenges included no precedence for study design as no regulatory type of studies were conducted in this indication. We needed to switch the primary endpoint to 2-year recurrence rate, as suggested by FDA, versus time to recurrence, which is commonly used in oncology.

> We used meta-analysis data as the effect size to power the studies. This has significant heterogeneity in treatment effect based on literature available in 2004.
>
> The effect with TURBT alone 1 was not the same as placebo-controlled in these studies, as Dr. Shore mentioned. Thus, clinically relevant treatment effect of immediate intravesical therapy was not well understood for a 2-year recurrence endpoint at the time of the study design.
>
> Nevertheless, why do we think our results are so convincing? It is because of the remarkable consistency and reproducibility of efficacy in two large, well-controlled studies, and in the majority of the subgroups of patients.
>
> Our pivotal program provides the largest database of well-controlled studies. The estimated treatment effect is clinically meaningful in view of the recent literature data and development in this disease space.
>
> We have performed several multivariate and subgroup analysis using demographics, baseline status, and time of instillations. The details are in your briefing book. As you see, with odds ratios from the forest plots of two studies, apaziquone demonstrated favorable treatment effect in all subgroups with no considerable differences except for time of instillation. This includes primary versus recurrent, single versus multi-focal tumors, grade 1 versus grade 2.
>
> However, since apaziquone is inactivated by blood, we looked at a time window threshold of at least 30 minutes post-TURBT to see any difference, as this is a typical time for hematuria to recede when a patient undergoes TURBT procedure.
>
> In approximately 60 percent of the total patients enrolled in this time window, we have seen much higher efficacy in patients instilled at least 30 minutes post-TURBT.
>
> Here is a summary of recurrence rate and time to recurrence in patients dosed at least 30 minutes after TURBT. The absolute difference in recurrence was consistent and was at least 10 percent in both studies, favoring apaziquone, with study 612 meeting nominal p-value of less than 0.05. Moreover, the time to recurrence was significantly improved in both studies.
>
> Here are the Kaplan-Meier curves showing significant improvement in time-to-recurrence data in two studies with nominal p-value of less than 0.05. These results are real. These are reproducible, consistent between two studies, and

> not hypothesis-generating. We propose apaziquone to be instilled at least 30 minutes after TURBT in our dosing recommendations.
>
> In summary, apaziquone demonstrated strong anti-tumor activity from two early phase studies. We have two large well-controlled studies in phase 3 that form the largest database for any intravesical therapy.
>
> We have demonstrated reproducible improvements in primary as well as secondary endpoint in two studies. The treatment effect is supported by recent recommendations of international bladder cancer group.
>
> We have also shown that the efficacy is consistent across most patient subgroups. In particular, we have shown that 4-milligram apaziquone, when dosed at least 30 minutes after a TURBT, provides a much better efficacy with significant time to recurrence improvement in both studies.
>
> Overall, the data we presented from two studies provides substantial evidence of efficacy. We believe that the treatment effect we observed is not due to variability in the underlying disease, as we have shown in multiple subgroups of patients, and study bias, or due to chance alone.

148. In response, Dr. Gwynn Ison, FDA Medical Officer, began the FDA's case, restating, in relevant part that:

> We note that study 611 was conducted under a special protocol assessment, or SPA agreement. We point out that the study was designed to detect a 12 percent decrease in 2-year recurrence for patients treated with apaziquone compared with placebo.
>
> This highlights the regulatory history of this application. As I mentioned, in 2007, an SPA agreement was given by the division for study SPI-611. Study 612 was designed to be almost identical.
>
> In December of 2012, a pre-NDA meeting occurred where the topline results of both studies, 611 and 612, were presented by the applicant. Each study individually failed to meet the stated objective, namely an improvement in the primary endpoint of recurrence in the first two years. At the meeting, the applicant presented a pooled analysis of the primary endpoint from the two trials.
>
> FDA informed the applicant that the pooling of data from two trials that did not meet the pre-specified criteria establishing the efficacy of apaziquone would not be acceptable to

> support a regulatory approval. FDA advised the applicant not to submit an NDA based on these data, and it was noted that if they did decide to file their NDA based on the data, then a public discussion at an ODAC would be required.
>
> The sponsor subsequently submitted their NDA based on study 611 and 612, three years later, in December 2015.

149. Also on behalf of the FDA, Statistical Reviewer, Erik Bloomquist, PhD, presented analysis and conclusion that apaziquone demonstrated no significant effect over placebo—matters the FDA had conveyed to Defendants in December, 2012—stating, in relevant part:

> To begin, the applicant relied upon four analyses to demonstrate sufficient evidence of an effect. However, after reviewing the application, FDA believes none of these analyses do demonstrate significant effect of apaziquone over placebo for the following reasons.
>
> ***
>
> Now, this point is very important. Since both confidence intervals contain zero percent, essentially no difference between apaziquone and placebo, neither study has demonstrated that apaziquone is different from placebo with respect to 2-year recurrence rate.
>
> ***
>
> Based upon the analyses shown, FDA believes6 that both study 611 and 612 have failed to demonstrate sufficient or significant evidence that apaziquone has an effect on tumor recurrence when compared to placebo. Most importantly, the confidence intervals for the difference in 2-year recurrence in both studies contained zero, no difference, so neither study demonstrates that apaziquone is different from placebo.
>
> In addition, the estimated 6 percent difference was half the expected difference at the design stage that was considered clinically meaningful, and the 6 percent difference is less than half the effect reported in a recent meta-analysis comparing instillation of other treatments versus no instillation, as discussed earlier by Dr. Lerner.
>
> Finally, as discussed by Gwynn Ison, missed cystoscopies the final visit could possibly diminish the observed difference in 2-year recurrence. Imputing the recurrence values for those without their 24-month visit, in a worst case scenario for apaziquone, could possibly give a negative 2

percent difference in the 2-year recurrence. Imputing the last observation as recurrence in both treatment arms, the 2-year recurrence could vary from 4 percent in study 611 to 7 percent in study 612.

***

In addition to the primary endpoint of 2-year recurrence and time to recurrence, the applicant has proposed two additional analyses to help support their application. The first is a pooled analysis of study 611 and 612, and the second is an exploratory subgroup analysis based upon the time from surgery to instillation of apaziquone. FDA however once again does not believe either of these analyses provides sufficient evidence of efficacy of apaziquone for the following reasons.

***

Because the pooled analysis presented by the applicant has little effect on the difference in 2-year recurrence, and simply shrinks the confidence intervals as a function of the increased sample size, and this is an unplanned, post hoc analysis, FDA does not consider the pooled analysis as providing additional evidence beyond that provided by study 611 or 612.

In terms of regulatory guidance for the applicant's pooling analysis, FDA refers to ICH document E9, titled Statistical Principles for Clinical Trials. ICH E9 is an internationally recognized guidance document for statistical practice in clinical trials.

Per the document, individual clinical trials should always be large enough to satisfy their own objectives. And second, under exceptional circumstances, a meta-analytic approach may also be the most appropriate way, or the only way of providing sufficient overall efficacy via an overall hypothesis test. When used for this purpose, the meta-analysis should have its own prospectively written protocol.

In addition to the pooled analysis presented, the applicant also focused on a subgroup analysis of time from surgery to instillation of apaziquone. The applicant believes that time to instillation is an important efficacy subgroup. The applicant hypothesizes that blood inactivates the active part of apaziquone, so instillation of apaziquone immediately after surgery decreases efficacy. The applicant has focused on individuals instilled 30 minutes post-surgery when bleeding would be possibly less of a factor.

***

> Because the subgroup analysis used pooled data from both trials, after the outcomes were known, and are likely to be overly optimistic, FDA does not believe this analysis provides sufficient evidence of a claim of efficacy of apaziquone. Instead, this analysis suggests an intriguing hypothesis to test in the ongoing trial. There is strong regulatory guidance to support FDA's position that the applicant's subgroup analysis can only be considered exploratory.
>
> ***
>
> In conclusion, the applicant submitted studies 611 and 612 to demonstrate efficacy of apaziquone on recurrence in bladder cancer. After reviewing the application and data, FDA believes however that neither study demonstrate that apaziquone has an effect over placebo.
>
> First and foremost, both study 611 and 612 fail to meet their primary endpoint, and the observed 6 percent absolute difference is less than a 12 percent different that was considered clinically meaningful at the design stage. In addition, the 6 percent absolute difference is difficult to interpret in light of the missed visits.
>
> Second, the secondary analyses have an unknown level of type 1 error, precluding interpretation of the nominal p-values. In other words, we cannot rule out that the observed results for the secondary endpoint analysis and any subsequent analyses are not false positives here, and there is no assurance the observed effect is true.
>
> In addition, the post hoc nature of the pooling analysis makes their associated significance levels uninterpretable, and really the analysis does not add any additional information beyond that provided by study 611 or 612.
>
> Finally, the post hoc subgroup analyses generate an important hypothesis, but at this point do not provide sufficient evidence for efficacy. In summary, the analysis and results have not demonstrated a significant effect of apaziquone over placebo.

150. After a relatively short deliberation, the ODAC voted 14-0 that Spectrum had failed to show a treatment effect over placebo. As ODAC member Brent Logan, PhD, professor and director, division of biostatistics, Medical College of Wisconsin stated:

> So I completely agree with your point in general. So before we start talking is 16 percent clinically important for the patients, we have to establish whether the data suggests that there is actually a robust evidence that there is a benefit. I don't think that we see that so far.
>
> If you look at the two primary trials, neither one of them met their target of establishing evidence at a 5 percent significance level. The sponsor has discussed this pooled meta-analysis, which they say is statistically significant at a 5 percent level. A meta-analysis -- so even throwing aside the issue of not having a pre-specified plan for the meta-analysis, which introduces additional uncertainty about how reliable those results are, but even throwing that aside, the level of statistical rigor that a single meta-analysis at a 5 percent level has versus two trials, both meeting a target of efficacy at a 5 percent significance level, those are two different thresholds.
>
> If you consider the false positive rate associated with them, meeting a significance level of 5 percent on two randomized trials is associated with a false positive rate of about 5 percent squared, or 0.25 percent. If you look at the meta-analysis, that's got a false positive rate of 5 percent. So that's much more uncertainty in terms of whether there's a real benefit here if you look at the combined meta-analysis results.
>
> So that's just one aspect. Then as I mentioned, there is the uncertainty with the lack of a pre-specified analysis plan for the meta-analysis.
>
> The other issues that have been raised, the secondary analyses is a major issue. If you don't establish that the primary analysis is significant, you don't have any alpha or any significance level to even look at secondary analysis. Any looks at those is going to inflate the false positive rate and increase the chance that you're making a mistake, concluding that there's efficacy when there really isn't.
>
> Then the subgroup analysis is a post hoc analysis. The estimates that have been shown for the subgroup of more than 30 minutes instillation period, those are likely to be biased because of the post hoc selection of the cut points.
>
> So I guess my take is that there isn't -- that I totally agree that you have to establish that there's robust statistical evidence that there is even an effect here, and I don't think that bar has been met.

151. According to ODAC member Bernard F. Cole, PhD, Professor of Mathematics and Statistics at the University of Vermont:

> I agree completely with Dr. Logan's comments. And just from a more simplistic kind of viewpoint, ***this is what I tell my students how not to do things***. And that is, if you get a result, you do an analysis, you get a result and you don't like it, you add data, and you can keep doing that, and eventually you get the result that you want. And that's true.
>
> We have to be really careful when we add data to a study, and then reanalyze and try to make a conclusion out of it.
>
> To answer Dr. Pazdur's question, I don't know. I don't know the actual false positive rate of this kind of study design, where you run two separate studies, neither one reaches the primary goal, and then you pool results, and get an answer. I don't know. And Dr. Bloomquist actually said that in his presentation very well; it's unknown. (Emphasis added).

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

152. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Spectrum securities traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

153. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Spectrum securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Spectrum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

154. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

155. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

156. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Spectrum;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused Spectrum to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of Spectrum securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

157. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

158. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Spectrum securities are traded in efficient markets;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased and/or sold Spectrum securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

159. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

160. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 against All Defendants**

161. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

162. This Count is asserted against Spectrum and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

163. During the Class Period, Spectrum and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

164. Spectrum and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Spectrum securities during the Class Period.

165. Spectrum and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Spectrum were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Spectrum, their control over, and/or receipt and/or modification of Spectrum allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Spectrum, participated in the fraudulent scheme alleged herein.

166. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Spectrum personnel to members of the investing public, including Plaintiffs and the Class.

167. As a result of the foregoing, the market price of Spectrum securities was artificially inflated during the Class Period. In ignorance of the falsity of Spectrum's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Spectrum securities during the Class Period in purchasing Spectrum securities at prices that were artificially inflated as a result of Spectrum's and the Individual Defendants' false and misleading statements.

168. Had Plaintiffs and the other members of the Class been aware that the market price of Spectrum securities had been artificially and falsely inflated by Spectrum's and the Individual Defendants' misleading statements and by the material adverse information which Spectrum's and the Individual Defendants did not disclose, they would not have purchased Spectrum's securities at the artificially inflated prices that they did, or at all.

169. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

170. By reason of the foregoing, Spectrum and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Spectrum securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act against the Individual Defendants**

171. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

172. During the Class Period, the Individual Defendants participated in the operation and management of Spectrum, and conducted and participated, directly and indirectly, in the conduct of Spectrum's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Spectrum's business practices.

173. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Spectrum's financial condition and results of operations, and to correct promptly any public statements issued by Spectrum which had become materially false or misleading.

174. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Spectrum disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Spectrum to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Spectrum within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Spectrum securities.

175. Each of the Individual Defendants, therefore, acted as a controlling person of Spectrum. By reason of their senior management positions and/or being directors of Spectrum, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Spectrum to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Spectrum and possessed the power to control the specific

activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

176. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Spectrum.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: November 21, 2017

Respectfully submitted,

**LEVERTY & ASSOCIATES LAW CHTD.**

/s/ *Patrick R. Leverty*
Patrick R. Leverty (Nev. Bar No. 8840)
William Ginn
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

***Liaison Counsel for Lead Plaintiffs***

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com

and

Jacob A. Goldberg
Leah Heifetz
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19012
Telephone: (215) 600-2187
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
lheifetz@rosenlegal.com

**BRONSTEIN GERWITZ & GROSSMAN, LLC**
Peretz Bronstein
Shimon Yiftach
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
shimony@bgandg.com

***Co-Lead Counsel for Lead Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2017, I electronically filed the foregoing ***Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**LEVERTY & ASSOCIATES LAW CHTD.**

By: /s/ *Patrick R. Leverty*